# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) JOSEPH BREWER, and <br> (2) JOSHUA CHUCK and <br> (3) JASON MOODY, and <br>  individually and on behalf of <br>  all others similarly situated, <br><br>                Plaintiffs, <br>     v. <br><br> (1) ALLIANCE COAL, LLC, and <br> (2) THE BOARD OF ALLIANCE <br>  COAL, INC., and <br> (3) THE 401(k) INVESTMENT <br>  COMMITTEE OF ALLIANCE <br>  COAL, INC. and <br> (4) JOHN DOES 1-20, <br><br>                Defendants. | **CIVIL ACTION NO.: 24-cv-00406-SH** |

## CLASS ACTION COMPLAINT

Plaintiffs, Joseph Brewer, Joshua Chuck and Jason Moody ("Plaintiffs"), by and through their attorneys, on behalf of the Alliance Coal, LLC and Affiliates Profit Sharing and Savings Plan ("Plan"),"[1] themselves and all others similarly situated, state and allege as follows:

## I.  INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Alliance Coal, LLC ("Alliance" or "Company"), the Board of

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Directors of Alliance Coal, LLC, and its members during the Class Period[2] ("Board"), and the

401(k) Investment Committee of Alliance Coal, LLC and its members (the "Committee") during

the Class Period, for breaches of their fiduciary duties.

2.    To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary

duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act

"solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the

"care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.

29 U.S.C. § 1104(a)(1)(B).

3.    The Department of Labor ("DOL") has explicitly stated that employers are held to

a "high standard of care and diligence" and must, among other duties, both "establish a prudent

process for selecting investment options and service providers," including providers of plan the

Plan's administrative and recordkeeping ("RKA") services.[3]

4.    The Tenth Circuit has also recognized a fiduciary's stringent duties under ERISA:

A central and fundamental obligation imposed on fiduciaries by ERISA is
contained in Part 4, Title 1, § 404(a) [which] … embody a carefully tailored law of
trusts, including the familiar requirements of undivided loyalty to beneficiaries, the
prudent man rule, the rule requiring diversification of investments and the
requirement that fiduciaries comply with the provisions of plan documents to the
extent that they are not inconsistent with the Act.

*Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978); *see also In re Williams Cos. ERISA Litig.*, 271

F. Supp. 2d 1328, 1341 (N.D. Okla. 2003) (noting ERISA's fiduciary duties are the highest known

to the law.)

---

[2] The Class Period, as will be discussed in more detail below, is defined as September 4, 2018 through the date of judgment.

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

5.      With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[4]

6.      At all times during the Class Period, the Plan had about $500 million in assets under management. At the end of fiscal year 2022 and 2021, the Plan had $476,692,867 (*see* Schedule H attached to 2022 Form 5500, at 2[5]) and $552,887,173 (*see* Schedule H attached to 2021 Form 5500, at 2), respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

7.      The Plan is also large in terms of the number of its participants. From 2018 to 2022, the Plan had between 3,828 and 4,271 participants with account balances. In 2020, only 0.9 percent (5,807 of 616,050) of plans in the country had between 1,000 and 4,999 plan participants.[6] In addition, this was true at the start of the Class Period in 2018 where only 1 percent (5,807 of 586,622) of 401(k) plans in the country had between 1,000 and 4,999 plan participants.[7]

8.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's RKA costs.

9.      Another way in which Defendants breached their duty to Plan participants was in failing to defray[] reasonable expenses of administering the [Plan]. 29 U.S.C. § 1104(a)(A)(ii).

---

[4] *Id.*

[5] The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2020 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf.

[7] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

Their failure stems from the use of Plan participant forfeited funds to reduce Company contributions to the Plan instead of using the funds to reduce or eliminate the amounts charged to Plan participants for RKA services. This action by the Company was a clear breach of the duty of loyalty to Plan participants and cost Plan participants millions of dollars.

10.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

11.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), breach of the fiduciary duty of loyalty (Count II), breach of ERISA's Anti-Inurement Provision (Count III) and failure to monitor fiduciaries (Count IV).

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

13.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**Plaintiffs**

15.    Plaintiff, Joseph Brewer ("Brewer"), resides in Moranfield, Kentucky. During his employment, Plaintiff Brewer participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Brewer suffered injury to his Plan account by overpaying for his share of RKA costs.  Plaintiff Brewer also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Brewer's individual account to pay for the RKA costs.

16.    Plaintiff, Joshua Chuck ("Chuck"), resides in Kensington, Ohio. During his employment, Plaintiff Chuck participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Chuck suffered injury to his Plan account by overpaying for her share of RKA costs.  Plaintiff Chuck also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Chuck's individual account to pay for the RKA costs.

17.    Plaintiff, Jason Moody ("Moody"), resides in Mt. Airy, MD. During his employment, Plaintiff Moody participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Moody suffered injury to his Plan account by overpaying for her share of RKA costs.  Plaintiff Moody also suffered injury due to the fact that Defendants failed to use forfeited Plan funds to pay Plan RKA costs which, if used to pay

for RKA costs, would have reduced or eliminated the amounts charged to Plaintiff Moody's individual account to pay for the RKA costs.

18.     Plaintiffs did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

19.     Alliance is the sponsor of the Plan and a named fiduciary of the Plan with a principal place of business in Tulsa, Oklahoma. *See* the 2022 Form 5500 at 1. Alliance operates as a coal mining company. Alliance also manufactures thermal and metallurgical products with varying heat and sulfur content, as well as steel-making and other solutions. Throughout the Class Period, Alliance had about 5,000 employees.

20.     Alliance appointed the Committee to, among other things, ensure that the Plan paid a reasonable rate for RKA services given the size of the Plan. *See* the Alliance Coal, LLC and Affiliates Profit Sharing and Savings Plan, Effective as of January 1, 2015 ("Plan Doc."), at 4 ("Committee means the administrative committee appointed by the Company to administer the Plan."). As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

21.     Accordingly, during the putative Class Period, Alliance is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

22.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

23.     Alliance, acting through its Board, among other things, is charged with ensuring that the Plan had no more expense than reasonable and/or paid a reasonable rate for RKA services given the size of the Plan. *See* Independent Auditors' Report attached to 2022 Form 5500 ("2022 Auditors' Report"), at 6 ("The Investment Committee, which is a committee appointed by the Company's board of directors, oversees the Plan."). As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

24.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

25.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

26.     As discussed above, Alliance and the Board appointed the Committee to, among other things, ensure that the Plan had no more expense than reasonable and/or paid a reasonable rate for RKA services given the size of the Plan. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan assets.

28.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

29.     To the extent that there are additional officers, employees and/or contractors of Alliance who are/were fiduciaries of the Plan during the Class Period, or were hired as Plan consultants during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 41-50 include, but are not limited to, Alliance officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS[8]

30.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[9]

---

[8] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[9] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 4, 2018 through the date of judgment (the "Class Period").

31.     The members of the Class are so numerous that joinder of all members is impractical. The 2022 Form 5500 lists 4,225 Plan "participants with account balances as of the end of the plan year." *See* 2022 Form 5500 at 2.

32.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

33.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.      Whether Defendants are/were fiduciaries of the Plan;

B.      Whether Defendants breached their fiduciary duties of prudence and loyalty by engaging in the conduct described herein;

C.      Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

34.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

35.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

36.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

37.     The MAPCO Coal Inc. and Affiliates Profit Sharing and Savings Plan was adopted as of September 10, 1996, by MAPCO Coal Inc. to provide retirement benefits to certain employees of the company and its affiliates. *See* Alliance Coal, LLC and Affiliates Profit Sharing and Savings Plan, Effective as of January 1, 2015, at 1.

38.     On August 1, 1999, MAPCO Coal Inc. was renamed Alliance Coal, LLC, and the plan was renamed the Alliance Coal, LLC and affiliates Profit Sharing and Savings Plan. *See id.*

39.     Effective January 1, 2015, the Plan was amended and restated. *See id*.

40.     The Plan and the trust are intended to be a tax-qualified plan and trust under Sections 410(a) and 501(a) of the Internal Revenue Code of 1986, as amended. *Id*.

41.     The purpose of the Plan is to provide retirement benefits to employees who satisfy the requirements for participation in the Plan. *Id*.

42.     The benefits provided by the Plan are paid from a Trust established by Alliance. *Id*.

43.     The Plan is a "defined contribution plan." *See* Summary Plan Description, in the Alliance Coal Benefits Handbook ("SPD"); *see also* 2022 Auditors' Report, at 6 ("The Plan is a defined contribution plan established for the benefit of the employees of [Alliance] and adopting employers . . ., except for temporary, seasonal, contract, leased or collective bargaining employees, or nonresident aliens. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

### *Eligibility*

44.     In general, regular full-time employees are eligible to participate in the Plan from their first day of service. *See* Plan Doc., at Sec. 3.1 ("An Eligible Employee shall be eligible to participate in the Plan upon completing on Hour of Service."); *see also* SPD, at 212 ("Except as provided below, you are eligible to participate in the Plan if you are a full-time employee of a participating employer. You are a full-time employee if you are scheduled to work at least 1,000 hours during a calendar year for a participating employer.").

45.     In general, part-time employees are eligible to participate in the Plan after three years of service. *See* SPD, at 213.

*Contributions*

46.    There are several types of contributions that can be added to a participant's account, including: a percentage of eligible pay each pay period on a pre-tax, after-tax and/or a Roth 401(k) contributions. *See* SPD, at 216.

47.    With regard to employee contributions in the Plan, participants "may contribute, in whole percentages, from 1% to 50% of [their] eligible compensation as either or a combination of pre-tax, Roth 401(k) and/or after-tax contributions." *Id*. "The Plan also provides for Employer matching and nonmatching contributions. These contributions vary by affiliate according to the Plan document. Employer matching and nonmatching contributions are based on deferrals made each payroll period." 2022 Auditors' Report, at 6.

48.    Like other companies that sponsor 401(k) plans for their employees, Alliance enjoys both direct and indirect benefits by providing matching contributions to the Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

49.    Alliance also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

50.    Given the size of the Plan, Alliance likely enjoyed significant tax and cost savings from offering a match.

*Vesting*

51.    Participants are immediately vested in all employee contributions. *See* Plan Doc., at Sec 4.1(c) ("Pre-Tax Contributions and Catch-Up Contributions shall be fully vested at all times.").

52.    Participants are immediately vested in all employer matching contributions as well. *See* Plan Doc., at Sec. 5.2 ("Employer Matching Contributions shall be fully vested at all times."); *see also* SPD, at 225 ("You are always 100% vested in your pre-tax contributions, after-tax contributions, Roth contributions, and employer matching contributions.").

53.    After three (3) years, employees are fully vested in employer nonmatching and profit sharing contributions. *See* Plan Doc., at Secs. 5.3 and 5.5; *see also* 2022 Auditor's Report, at 7 ("Employer nonmatching and profit sharing contributions become fully vested after three years of service.").

*Forfeiture Accounts*

54.    Forfeitures include "[t]he nonvested balance of the Employer Profit Sharing Contribution Account and Employer Supplemental Contribution Account." Plan Doc., at Sec. 8.4(d).

55.    Forfeitures also include "benefits which the Committee has directed to be paid to Participants and Beneficiaries but which are not distributed because of the Committee's inability, after reasonable search, to locate a Participant or Beneficiary within a period of two years after payment of benefits become due." Plan Doc., at Sec. 8.10.

56.    Pursuant to the Plan document, forfeitures shall be used initially to restore a re-employed employee's "Employer Profit Sharing Contribution Account or Employer Supplemental Contribution Account." Plan Doc., at Sec. 8.4(f).

57.     Following restoration of previously forfeited Plan accounts, the Committee may use forfeitures to "pay Plan expenses or reduce Employer contributions, at the discretion of the Company." Plan Doc., at Sec. 8.4(d).  As further explained, "[f]orfeitures are first used to restore participant balances previously forfeited, then may be used to pay Plan administrative expenses, and lastly to reduce Employer contributions." 2022 Auditor's Report, at 7.

### *The Plan's Investments*

58.     The Plan's assets under management for all funds as of December 31, 2022 was $476,692,867. *See* Schedule H, attached to 2022 Form 5500, at 2.

### *Payment of Plan Expenses*

During the Class Period, administrative expenses were paid for using the Plan's assets. *See* 2022 Auditor Report, at 8 ("The Plan allows certain administrative expenses to be paid from Plan assets."); *see also* SPD, at 235 ("All administrative and investment-related fees related to the Plan (and Trust) will be paid from Plan assets, unless they are paid by the Plan Sponsor. Administrative expenses that are paid from Plan assets will be charged against your account and will be listed on your participant statement.").

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.    The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

59.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

60.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

61.   "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

**ERISA's Fee Disclosure Rule**

62.   In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [10]

63.   The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

64.   As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

---

[10] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet")

65.     For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

66.     The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

67.     A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

68.     Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g*., plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B.     Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants**

69.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

70.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.     Recordkeeping;

B.     Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C.     Administrative services related to converting a plan from one recordkeeper to another;

D.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E.     Maintenance of an employer stock fund (if needed);

F.     Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G.     Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H.     Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

I.     Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and

the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J.      Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

71.      This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

72.      The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

A.      Loan processing;

B.      Brokerage services/account maintenance (if offered by the plan);

C.      Distribution services; and

D.      Processing of qualified domestic relations orders.

73.      All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

74.     The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[11] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[12]

75.     In general, the level, number and character of participant services provided by the record keeper have minimal impact upon the costs of providing record keeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large, fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

76.     Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

---

[11] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[12] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

77.     Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

78.     The incremental costs caused by additional participants may include: mailing costs, if materials are delivered by mail versus Internet; telephone inquiries through an 800 number; check distributions from the 401(k) plan to the participant; and/or any in person or off line participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

79.     Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

80.     During the Class Period, the recordkeeper for the Plan was INTRUST Bank, N.A. ("Intrust").[13] *See* SPD, at 236.

81.     Intrust served as the recordkeeper for approximately fifty (50) plans.

82.     The Plan was by far the largest retirement plan – in terms of plan participants and assets under management – for which Intrust served as recordkeeper.

83.     In fact, the second largest plan for which Intrust served as recordkeeper was its own retirement plan, the Intrust 401(k) Plan. At the end of 2022, the Intrust 401(k) Plan had 1,142 plan participants (*see* 2022 Form 5500 for Intrust 401(k) Plan, at 2) and $157,789,790 assets under management. *See* Schedule H attached to 2022 Form 5500 for Intrust 401(k) Plan, at 2).

84.     By selecting Intrust as the Plan's recordkeeper, which had no experience providing services for a plan of this size, the RKA expenses paid by Plan participants were much higher than what they could have been had the Defendants selected a more experienced recordkeeper like the ones described above (*i.e.* recordkeepers such as Fidelity, Vanguard, Empower, and Voya, among

---

[13] The SPD identifies NestEgg Consulting, Inc. as the recordkeeper. NestEgg Consulting, Inc. was acquired by Intrust in 2014.

others) that invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients.  As indicated below, Intrust is not in the top of plan recordkeepers:

**2020 TOP PROVIDERS (RECORDKEEPERS)[14]**

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

85.     All the above recordkeepers are capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

86.     As demonstrated below, and predictably given the inexperience of Intrust, Plan participants paid higher RKA costs than participants of plans of similar size and with more experienced recordkeepers.

**C.     Much Information Regarding the Reasonableness of Fees for Recordkeeping Services are in the Sole Possession of Defendants**

87.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants. The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

---

[14] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/.

88.    Other information has also not been made available to Plaintiffs. For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

89.    More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

90.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[15]

91.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

92.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe at minimum the fiduciary topics discussed and the rationale for resulting decisions.

---

[15] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

Any related documents or data considered for purposes of the fiduciary review (e.g., market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.

93.     In an attempt to discover the details of the Plan's mismanagement, on February 18, 2022, Plaintiffs wrote to Alliance Coal requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated March 21, 2022, Alliance responded to the February 18, 2022, and did not provide any meeting minutes from the Committee.

94.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that's not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

95.     In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

96.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

97.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and recordkeeping fees which wasted the assets of the Plan and the assets of participants.

**D.    Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Recordkeeping Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Recordkeeping Fees**

**1.    The Plan's Recordkeepers Offered Routine Services**

98.    The RKA services performed each year for the Plan during the Class Period were similar so we can look at the Plan's 2020 Form 5500, Schedule C as an example year. The Schedule C lists the following codes indicating the type of general services performed by the recordkeeper: 15, 37, 50, 63, and 64. Below is a description of the recordkeeping codes:

> 15 – Recordkeeping and information management (computing, tabulating, data processing etc.)
>
> 37 – Participant loan processing
>
> 50 – Direct payment from the plan
>
> 63 – Distribution (12b-1) fees
>
> 64 – Recordkeeping fees

*See* Instructions for the 2022 Schedule C (Form 5500) available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2022-instructions.pdf at 25-29. Again, the above services are not out of the ordinary of the services other national recordkeepers provide. Any fees

associated with other ancillary a la carte services performed by the Recordkeepers would be negligible because it is on a participant-by-participant basis instead of plan-wide.

99.    While it may not be *per se* imprudent for a plan to select a recordkeeper with no experience with a plan of this size, here it seems that it had disastrous effects on participants' retirement savings. It's difficult to understand how the Plan could taken advantage of its economies of scale to get the best possible record-keeping fees when it utilized a recordkeeper with such limited experience with large plans. Given the Plan's high recordkeeping fees during the Class Period, as will be discussed in more detail below, it would have been prudent for the Defendants to select a recordkeeper with more experience recordkeeping for a plan of this size.

### 2.    There is No Indication Defendants Negotiated to Reduce the Plan's Recordkeeping Fees During the Class Period

100.    As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

101.    Here, the fact that the Plan paid the relatively same amount of excessively high recordkeeping fees from 2018 to 2022, there is little to suggest that Defendants conducted a RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

102.    Had the Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs.

**3.  The Plan's Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases**

103.  Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

104.  As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

105.  The Plan's per participant RKA fees were as follows:[16]

| Year | Participants (PP) | Total RKA Reported | $PP |
|------|------|------|------|
| 2018 | 4,213 | $685,046 | $162.60 |
| 2019 | 4,271 | $943,653 | $220.94 |
| 2020 | 3,711 | $791,714 | $213.34 |
| 2021 | 3,828 | $796,837 | $208.16 |
| 2022 | 4,225 | $756,538 | $179.06 |

106.  The above fees were astronomical when benchmarked against similar plans.

107.  During the Class Period, the Plan had a low of 3,711 total participants in 2020 to a high of 4,271 total participants in 2019 making it eligible for some of the lowest fees on the market.

---

[16] To keep the total fees consistent with the comparator plans analyzed below, the total fee was determined by adding any amounts reported on Schedule C of the Plan's 5500s which are reported as either direct or indirect costs and which are coded in the categories discussed above as common RKA coding which include but are not limited to 13, 14, 15, 16, 37, 50, 60, 62, 64 and 65. Excluded from these amounts are any amounts reported as, including but not limited to, legal, accounting and/or consulting fees. Although no indirect costs are reported it is expected that once the total amount of revenue sharing is known this amount will increase.

Further, at all times during the Class Period, the Plan had about $500 million in assets under management.

108.    The leading publication that collects 401(k) data, BrightScope/ICI, categorizes plans in the following tranches:

EXHIBIT I.2

**Universe of 401(k) Plans**

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2018

| Plan assets | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Less than $1M | 343,108 | 58.5% | 6,007.5 | 8.4% | $107.1 | 2.1% |
| $1M to $10M | 208,789 | 35.6 | 13,660.6 | 19.1 | 620.7 | 12.2 |
| >$10M to $50M | 26,458 | 4.5 | 9,894.5 | 13.9 | 532.4 | 10.4 |
| >$50M to $100M | 3,564 | 0.6 | 4,808.0 | 6.7 | 247.1 | 4.8 |
| >$100M to $250M | 2,407 | 0.4 | 6,744.8 | 9.5 | 374.7 | 7.3 |
| >$250M to $500M | 1,034 | 0.2 | 5,395.1 | 7.6 | 362.1 | 7.1 |
| >$500M to $1B | 603 | 0.1 | 4,763.9 | 6.7 | 424.1 | 8.3 |
| More than $1B | 659 | 0.1 | 20,073.4 | 28.1 | 2,439.7 | 47.8 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

| Number of plan participants | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Fewer than 100 | 522,277 | 89.0% | 10,960.2 | 15.4% | $709.2 | 13.9% |
| 100 to 499 | 50,477 | 8.6 | 9,841.2 | 13.8 | 549.9 | 10.8 |
| 500 to 999 | 6,375 | 1.1 | 4,424.5 | 6.2 | 266.1 | 5.2 |
| 1,000 to 4,999 | 5,807 | 1.0 | 12,136.0 | 17.0 | 886.3 | 17.4 |
| 5,000 to 9,999 | 842 | 0.1 | 5,828.1 | 8.2 | 506.0 | 9.9 |
| 10,000 or more | 844 | 0.1 | 28,157.8 | 39.5 | 2,190.4 | 42.9 |
| All plans | 586,622 | 100.0 | 71,347.7 | 100.0 | 5,108.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.
Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

109.    Accordingly, the $500 million to $1 billion asset mark is significant as all plans in that range are considered in a category of their own.

110.    Looking at recordkeeping costs for plans of a similar size during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers:

| Recordkeeper | Plan Name | Plan Year | Assets < $1b | Participants | Cost per participant[17] |
|---|---|---|---|---|---|
| Prudential | Menasha Corporation 401(k) Retirement Savings Plan ("Menasha Plan") | 2022 | $550,034,598 | 6,494 | $49 |
| Vanguard | Crowe LLP Retirement Plan ("Crowe Plan") | 2022 | $992,984,046 | 7,584 | $26 |
| Vanguard | Vista Outdoor Inc. 401(k) Plan ("Vista Plan") | 2022 | $440,444,788 | 7,295 | $33 |
| Empower | Smithfield Foods, Inc. Salaried 401(k) Plan ("Smithfield Plan") | 2022 | $609,602,621 | 6,382 | $45 |
| T. Rowe Price | Expeditors International of Washington, Inc. 401(k) Plan ("Expeditors Plan") | 2022 | $839,061,386 | 9,597 | $31 |
| | **Alliance Coal Plan** | **2022** | | **4,225** | **$179.06** |
| | | | | | |
| Prudential | Menasha Plan | 2021 | $640,648,316 | 5,684 | $57 |
| Vanguard | Crowe Plan | 2021 | $1,021,351,197 | 6,840 | $27 |
| Vanguard | Vista Plan | 2021 | $537,946,277 | 7,053 | $75 |
| Empower | Smithfield Plan | 2021 | $695,539,380 | 6,124 | $46 |
| T. Rowe Price | Expeditors Plan | 2021 | $976.068,028 | 8,937 | $38 |
| | **Alliance Coal Plan** | **2021** | | **3,828** | **$208.16** |
| | | | | | |
| Prudential | Menasha Plan | 2020 | $580,893,434 | 5,442 | $56 |
| Vanguard | Crowe Plan | 2020 | $974,220,566 | 6,025 | $69 |
| Vanguard | Vista Plan | 2020 | $445,685,114 | 6,232 | $63 |
| Empower | Smithfield Plan | 2020 | $644,466,966 | 6,266 | $47 |
| T. Rowe Price | Expeditors Plan | 2020 | $811,144,504 | 8,173 | $50 |
| | **Alliance Coal Plan** | **2020** | | **3,711** | **$213.34** |
| | | | | | |
| Prudential | Menasha Plan | 2019 | $505,668,714 | 5,522 | $58 |
| Vanguard | Crowe Plan | 2019 | $669,317,589 | 5,981 | $50 |
| Vanguard | Vista Plan | 2019 | $402,305,529 | 4,946 | $75 |

[17] Unless otherwise noted, these fees are taken from the Form 5500.

| Empower | Smithfield Plan | 2019 | $587,410,642 | 6,215 | $46 |
| T. Rowe Price | Expeditors Plan | 2019 | $670,597,569 | 8,321 | $25 |
| | **Alliance Coal Plan** | **2019** | | **4,271** | **$220.94** |
| | | | | | |
| Prudential | Menasha Plan | 2018 | $417,298,123 | 5,198 | $59 |
| Vanguard | Crowe Plan | 2018 | $703,299,870 | 5,799 | $44 |
| Vanguard | Vista Plan | 2018 | $348,255,387 | 5,937 | $56 |
| Empower | Smithfield Plan | 2018 | $500,178,777 | 6,149 | $46 |
| T. Rowe Price | Expeditors Plan | 2018 | $518,848,182 | 8,103 | $35 |
| | **Alliance Coal Plan** | **2018** | | **4,213** | **$162.60** |

111.    The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees by far. The Plan's $196.82 average per participant fee from 2018 to 2022 is more than four (4) times the average fee of $48 per participant from 2018 to 2022 for the 5 plans listed above.

112.    Notably, the five plans above were serviced by T.Rowe Price, Empower, Vanguard, and Prudential, each of whom are top ten recordkeepers, confirming that Intrust's RKA fees were excessively high given its lack of experience recordkeeping for large plans and not because of any other reason, such as the type of services it provided the Plan. Moreover, it would be inexplicable to say the services provided to the Plan by Intrust was 4 times more valuable than services provided to similarly sized plans by more experienced recordkeepers than Intrust.

113.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years of the Class Period.

114.    The Plan should have been able to obtain per participant recordkeeping fees in the $48 per participant range from the beginning of the Class Period based on its size and the routine nature of the recordkeeping services performed by Intrust. This fee range is consistent with the average recordkeeping fees paid by the largest plans in the country as demonstrated in the allegations above.

115.    The $48 range per participant fee is not an exact fee that every Plan participant should have paid. To the extent Defendants collected recordkeeping fees through an asset-based percentage fee, the amount participants paid for recordkeeping fees was a function of a percentage level and the assets in each participant's account. Meaning, the actual amounts paid by Plan participants varied according to the assets in their accounts.

116.    A lower dollar amount paid in fees is primarily reflective of a low balance in the participant's account. Therefore, if the average per participant fee was reduced to the $48 range, the pro rata rates for all participants, including those that were paying less than the $48 range, would drop proportionally according to the lever of assets in their accounts.

117.    Given the size of the Plan's assets and total number of participants during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

## E.    The Company Improperly Reduced its Plan Contributions Through Forfeiture Accounts

118.    Pursuant to the Plan document, the Investment Committee shall establish an investment fund "for the investment of contributions hereunder." Plan Doc., at Sec. 2.37.

119.    "All assets of the Plan shall be invested in the Investment Funds in accordance with the Participant's investment elections." Plan Doc., Sec. 7.9.

120.    During the Class Period, Defendants breached their ERISA fiduciary duties by misusing the Plan's assets for Defendants' own benefit and to the detriment of Plan participants.

121.    As explained above, any contributions in the Trust which do not vest, or which are not claimed by a Plan participant, are forfeited and placed in a forfeiture account.

122.    As further explained above, "[f]orfeitures are first used to restore participant balances previously forfeited, then may be used to pay Plan administrative expenses, and lastly to reduce Employer contributions." 2022 Auditor's Report, at 7.

123.    Defendants had the discretion to direct how forfeitures were used but were to use it to reduce employer contributions only as a last result.

124.    Defendants improperly used forfeited non-vested Plan assets since at least the beginning of the Class Period for the Company's own benefit to reduce future Company contributions instead of using the funds to benefit Plan participants. This was both a breach of the duty of prudence as well as duty of loyalty.

125.    According to information from the Plan's Form 5500, the following represents the balance in the Plan's forfeiture accounts during the Class Period, the amount of the forfeiture improperly used to offset Alliance's contributions to the Plan, and the amounts used to pay for Plan administration costs:

| Year | Forfeiture Balance | Amts. Used to Offset Employer Contributions | Amts Used to Pay Admin Costs |
|---|---|---|---|
| 2018 | $42,903.00 | $1,224.00 | $328,651.00 |
| 2019 | $70,414.00 | $328,651.00 | $386,510.00 |
| 2020 | $443,068.00 | $582,745.00 | $299,193.00 |
| 2021 | $324,711.00 | $521,968.00 | $390,967.00 |
| 2022 | $291,169.00 | $151,405.00 | $344,759.00 |
| Total | | $1,585,993.00 | |

126.    Based on the above chart, from the beginning of the Class Period through 2022, over $1.5 million was improperly steered from paying RKA costs and instead used to benefit the Company. Given the language in the Auditor's Report that forfeitures were only to be used as a last resort to offset employer contributions, no amount of forfeitures should have been used to offset employer contributions until there were no plan administrative expenses left to pay.

127.    Defendants effectively placed their own interests above the interests of the Plan and its participants and caused harm to the Plan and its participants by reducing Plan assets, not allocating forfeited funds to Plan participants' accounts, and also caused Plan participants to incur at least $1.5 million in expenses that could otherwise have been covered in whole or in part by forfeited funds.

128.    Additionally, based on the fact that in every year during the Class Period the amount of offset exceeded the balance of the forfeiture accounts, it is likely the Company used forfeiture funds from prior years to offset Company contributions. This is a violation of IRS and general ERISA requirement that forfeitures are to be exhausted during the year in which they are incurred.

### COUNT I
### Breach of Fiduciary Duty of Prudence
### (Asserted against the Committee)

129.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

130.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

131.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

132.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint, including failing to control the costs of the Plan's recordkeeping and administrative costs and using forfeitures to reduce employer contributions instead of defraying RKA costs.

133.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

134.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

135.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Breach of Fiduciary Duty of Loyalty**
**(Asserted against the Company, the Committee and Board Defendants)**

136.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

137.    At all relevant times, the Company, the Committee and its members during the Class Period, and the Board and its members during the Class Period ("Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

138.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).

139.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), the Loyalty Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

140.    The Loyalty Defendants failed to exercise their duty of loyalty to the Plan and its participants by utilizing forfeited funds in the Plan for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries.

141.    The Loyalty Defendants used these Plan assets for the purpose of reducing the Company's own contributions to the Plan, thereby saving the Company over one million dollars at the expense of the Plan which received decreased Company contributions and its participants and beneficiaries were forced to incur avoidable expense deductions to their individual accounts.

142.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses.

143.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore

any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

144.     Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### Breach of ERISA's Anti-Inurement Provision
### (Asserted against Alliance and the Board Defendants)

145.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

146.     Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

147.     Because all forfeited Plan participant funds are initially placed in the Plan's trust, these forfeited funds are Plan assets.

148.     The Companies' use of the forfeited funds to defray its own contributions to the Plan in order to save itself millions of dollars in funds that the Company would otherwise have to contribute to the Plan, caused the assets of the Plan to inure to the benefit of the Company in violation of 29 U.S.C. § 1103(c)(1).

149.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of ERISA's anti-inurement provision, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

150.    Each Loyalty Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT IV**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Alliance and the Board Defendants)**

151.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

152.    Alliance and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

153.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

154.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly to the Monitoring Defendants.

155.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

      (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions

and omissions, including with respect to allowing the Company to use forfeited

funds to pay for Plan RKA services; and

(b)    failing to remove Committee members whose performance was inadequate in

that they continued to maintain excessive RKA costs, all to the detriment of the

Plan and Plan's participants' retirement savings.

156.    As a consequence of the foregoing breaches of the duty to monitor, the Plan

suffered millions of dollars of losses. Had the Monitoring Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have

had more money available to them for their retirement.

157.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are

liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee

Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set

forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims

and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action

under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of

Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation

of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have

breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: September 3, 2024          **LYONS & CLARK, INC.**

/s/ Mark D. Lyons
Mark D. Lyons, Esquire
OBA #5590
Two Main Plaza Bldg,
616 South Main, Suite 201
Tulsa, OK  74119
Email:  lyonscla@swbell.net
Telephone: (918) 599-8844
Fax: (918) 599-8585

**CAPOZZI ADLER, P.C.**

/s/ Mark K. Gyandoh
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Admission* be requested)
James A. Maro, Esquire
PA Attorney ID #86420
(*Pro Hac Vice* to be requested)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
          jamesm@capozziadler.com
Telephone: (610) 890-0200
Fax: (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*