UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JOSEPH BREWER, | ) | |
| JOSHUA CHUCK, and | ) | |
| JASON MOODY, | ) | |
| individually and on behalf of all | ) | |
| others similarly situated | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 24-CV-0406-CVE-SH |
| | ) | |
| ALLIANCE COAL, LLC, | ) | |
| THE BOARD OF DIRECTORS OF | ) | |
| ALLIANCE RESOURCE MANAGEMENT | ) | |
| GP, LLC, and THE ADMINISTRATIVE | ) | |
| COMMITTEE OF ALLIANCE RESOURCE | ) | |
| MANAGEMENT GP, LLC, and | ) | |
| JOHN DOES 1-30, | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION AND ORDER</u>

Plaintiffs Joseph Brewer, Joshua Chuck, and Jason Moody, individually and on behalf of all

others similarly situated, filed an amended class action complaint (Dkt. # 27), alleging that

defendants violated provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"),

29 U.S.C. § 1001 <u>et</u> <u>seq.</u>, by breaching their fiduciary duties of prudence and loyalty, as well as by

violating the anti-inurement provision and failing to monitor other fiduciaries. Plaintiffs' claims

arise out of defendants' administration of the Alliance Coal, LLC and Affiliates Profit Sharing and

Savings Plan ("the plan"), a defined contribution plan that provides qualified participants with

retirement benefits.  Before the Court are defendants' motion to dismiss plaintiffs' amended complaint (Dkt. # 28), plaintiffs' memorandum and brief in opposition (Dkt. # 39), and defendants' reply brief in support of their motion to dismiss (Dkt. # 41).[1]

## I.

Alliance Coal, LLC ("Alliance") is a coal mining company that also manufactures thermal and metallurgic products like steel.  Dkt. # 27, ¶ 19; Dkt. # 28, at 7.  It employs approximately 5,000 people across the East Coast and Midwest, and its principal place of business is in Tulsa, Oklahoma. Dkt. # 27, ¶ 19.  As a benefit to its employees, Alliance offers a defined contribution employee pension benefit plan, which is subject to regulation under ERISA.  Id. ¶ 43; Dkt. # 28, at 7.  Alliance and defendant the Board of Directors of Alliance Resource Management GP, LLP ("the Board") are the plan sponsors, defendant the Administrative Committee of Alliance Resource Management GP, LLP ("the Committee") is the plan administrator, and collectively these entities are the plan's fiduciaries.  Dkt. # 27, ¶¶ 19-29; Dkt. # 28, at 9 (citing Dkt. # 28-2, at 42).  The plan is governed by the plan document,[2] which Alliance designed and drafted, and which sets out, inter alia, participants'

---

[1] Defendants filed supplemental authorities (Dkt. ## 42, 45, 51, 56), and plaintiffs filed supplemental authorities (Dkt. ## 47, 53), to which defendants responded (Dkt. ## 50, 55).

[2] Plaintiffs' amended complaint, Dkt. # 27, defendants' motion to dismiss, Dkt. # 28, plaintiffs' response, Dkt. # 39, and defendants' reply, Dkt. # 41, reference and cite to specific provisions of the plan document, titled the Alliance Coal, LLC and Affiliates Profit Sharing and Savings Plan, Effective as of January 1, 2015. Defendants state that they consider the document incorporated by reference into plaintiffs' amended complaint, Dkt. # 28, at 13, and attach a copy of the document to their motion to dismiss, Dkt. # 28-2.  In reviewing a motion under Federal Rule of Civil Procedure 12(b)(6), a court is limited to considering the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); see also Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010).  Plaintiffs have incorporated by reference the 2015 plan document, which forms the basis of their claims, and the Court will therefore consider the document.

benefits and employer contribution rates.  Dkt. # 28, at 2; Dkt. # 27, ¶ 20.

The plan fiduciaries hired INTRUST Bank, N.A. ("Intrust")[3] to serve as a recordkeeper, providing recordkeeping and administrative ("RKA") services typical of a defined contribution plan and helping deliver plan benefits in accordance with the plan document.  Id. ¶ 81; Dkt. # 39, at 11.  RKA services can be provided as a "bundle" of "standard services"—including transaction processing, consulting services, document services, compliance support, accounting and auditing services—or "à la carte"—meaning individual participants pay based on usage of individualized services including loan processing, brokerage services, and distribution services.  Dkt. # 27, ¶¶ 71-73.  For standard, bundled services, RKA costs are often allocated on a per-participant basis, which is "driven by the number of participants in a plan."  Id. ¶ 75.  As a result, plaintiffs assert that the greater the number of participants, the more the average cost per participant will decrease.  Id. ¶¶ 75-76.  For its work, Intrust is paid an RKA fee on a per-participant basis through direct charges to plan participants' individual accounts.  Dkt. # 27, ¶ 75; Dkt. # 28, at 17.

Plaintiffs allege that between 2018 and 2023 participants paid, on average, $180.38 per annum[4] in RKA fees.  Id. ¶ 100.  Plaintiffs calculated this number using Alliance's Form 5500s, which are publicly available "Annual Return[s]/Report[s] of [an] Employee Benefit Plan" filed with the Department of Labor and the Internal Revenue Service on a yearly basis to satisfy reporting requirements under ERISA.  Id. ¶¶ 112-13, 100 (citing Alliance's Form 5500s from 2018 through 2023); Mator v. Wesco Dist., Inc., 102 F.4th 172, 181 (3d Cir. 2024).  Plaintiffs used the Form 5500s

---

[3] The company was formerly known as NestEgg Consulting, Inc. prior to its acquisition by Intrust in 2014.  Dkt. # 27, ¶ 81 n.13.

[4] All RKA participant fees referenced herein are per annum.

to reach the $180.38 amount by adding the total common RKA fees coded and dividing by the total number of plan participants.  Dkt. # 27, ¶¶ 107, 112-13.  Defendants dispute this amount, asserting that Alliance's fee agreements with Intrust show that between 2018 and 2023, the average fees agreed to were between $20 and $30.  Dkt. # 28, at 13 (citing Dkt. # 28-17, at 2; Dkt. # 28-18, at 2; Dkt. # 28-19, at 2).[5]

According to plaintiffs, Intrust has served as a recordkeeper for fifty plans, and Alliance's is "by far the largest," both "in terms of participants and assets under management."  Id. ¶¶ 82-83.  Intrust has "no experience providing services for a plan of this size," and its relative inexperience compared to the top recordkeepers "in the very highly competitive 401(k) service provider arena" resulted in Alliance plan participants paying "higher RKA costs than participants of plans of similar size and with more experienced recordkeepers."  Id. ¶¶ 87-88.  Plaintiffs further argue that during the period between 2018 and 2023, defendants failed to solicit a request for proposal ("RFP") at regular intervals from competitor recordkeepers, which would have led to more favorable RKA fee rates.  Id. ¶ 103.  Plaintiffs compare Alliance's RKA fees with those reported on Form 5500s of five other defined contribution plans managed by more experienced recordkeepers (Prudential, Vanguard, Empower, and T. Rowe Price) between 2018 and 2023.  Id. ¶ 112.  The comparator plans range in participant numbers between 4,946 and 9,597, with between $348,255,387 and $1,030,902,759 in assets during the period between 2018 and 2023, whereas Alliance had between 3,711 and 4,492

_____

[5] Plaintiffs argue that defendants impermissibly submitted the fee agreements as exhibits, which defendants improperly "withheld from plaintiffs."  Dkt. # 39, at 14.  Plaintiffs also argue that defendants are asking the Court to accept as true the facts contained within the fee agreements, drawing inferences in defendants' favor.  Id. at 15.  The Court merely notes this discrepancy and does not accept any of the facts contained in either set of documents as true.  See Tal v. Hogan, 453 F.3d 1244, 1264 (10th Cir. 2006).

participants, with between $448,329,582 and $570,487,347 in assets during the period between 2018 and 2023. Id.; id. ¶ 6. The comparator plans' RKA fees range from $22 to $91 per participant, with an average of $49 per participant. Id. ¶ 112.

During the period between 2018 and 2023, the plan had $500 million in assets that were comprised of both contributions made by both participants and Alliance. Participants can elect to contribute between 1% and 50% of their compensation. Dkt. # 27, ¶¶ 46-47. Alliance also makes matching and nonmatching contributions, as well as supplemental and profit sharing contributions. Id. ¶ 47; Dkt. # 28-2, at 25-29. All employee contributions and employer matching contributions vest immediately; by contrast, employer nonmatching, supplemental, and profit sharing contributions vest after three years of employment. Id. ¶¶ 51-53. If a participant terminates employment before three years of service, those employer nonmatching, supplemental, and profit sharing contributions are treated as a forfeiture. Id. ¶ 54; Dkt. # 28-2, at 37-38. Likewise, if a payment is made to a participant or beneficiary but that person cannot be located after two years and reasonable search, that payment is also treated as a forfeiture. Dkt. # 27, ¶ 55; Dkt. # 28-2, at 41. By the plan's terms, "the Committee may use forfeitures to 'pay Plan expenses or reduce Employer contributions, at the discretion of the Company.'" Dkt. # 27, ¶ 57 (quoting Dkt. # 28-2, at 38). Plaintiffs argue that these terms are further defined by a 2022 auditor's report attached to the Form 5500, which states that "[f]orfeitures are first used to restore participant balances previously forfeited, then may be used to pay Plan administrative expenses, and lastly to reduce Employer contribution." Id. (quoting Dkt. #

28-8, at 31). The forfeitures were used by the plan administrator to both reduce Alliance's contribution obligations and defray some of the RKA expenses.[6] Plaintiffs allege that between 2018 and 2023, defendants failed to defray reasonable administrative expenses by using forfeited funds to reduce company contributions to the plan instead of using those funds to either reduce or eliminate RKA fees. Id. ¶ 9.

Plaintiffs raise four claims in their amended complaint. First, plaintiffs assert that the Committee breached its fiduciary duty of prudence by failing to control the plan's RKA costs, as well as by failing to use forfeitures to defray RKA costs, in lieu of using them to reduce employer contributions. Id. ¶¶ 131-37. Second, plaintiffs claim that Alliance, the Committee, and the Board, breached their fiduciary duty of loyalty "by utilizing forfeited funds for the benefit of the Company instead of the sole interest of the Plan participants and beneficiaries," when they used forfeited funds to reduce employer contributions instead of defraying participants' RKA costs. Id. ¶¶ 138-46. Third, plaintiffs contend that Alliance and the Board breached ERISA's anti-inurement provision by using the forfeited funds to defray the company's contribution to the plan instead of reducing participant RKA costs. Id. ¶¶ 147-52. Finally, plaintiffs claim that defendants Alliance and the Board failed to adequately monitor other fiduciaries, failing to ensure that the Committee had adequate

---

[6] In practice, it appears that defendants divided forfeitures between paying administrative expenses and reducing employer contributions. For example, a 2023 auditor's report that plaintiffs rely on, and is attached to the Form 5500, states that $168,484 in forfeitures was used to pay administrative expenses, whereas $450,886 in forfeitures was used to reduce employer contributions. Dkt. # 28-9, at 32. In 2021, $390,967 was used to pay administrative expenses, and $521,968 was used to reduce employer contributions. Dkt. # 28-7, at 31. In 2020, $299,193 was used to pay administrative expenses, and $582,745 was used to reduce employer contributions. Dkt. # 28-6, at 32. In 2019, $386,510 was used to pay administrative expenses, and $328,651 was used to reduce employer contributions. Dkt. # 28-5, at 30. Finally, in 2018, $328,651 was used to pay administrative expenses, and $1,224 was used to reduce employer contributions. Dkt. # 28-4, at 30-31; see also Dkt. # 27, ¶ 127.

6

qualifications and experience, were reporting to the Board regularly, and had sufficient financial resources and information. Id. ¶¶153-59. The parties agree that the failure to monitor claim is derivative of the underlying breaches. Dkt. # 39, at 32; Dkt. # 28, at 29.

Defendants move for dismissal (Dkt. # 28) under Federal Rule of Civil Procedure 12(b)(6), asserting that plaintiffs fail to raise any inference of imprudence under ERISA with respect to the claim related to RKA fees. Specifically, they assert that the four comparator plans do not provide the "meaningful benchmark" required to state a claim regarding RKA services. Id., at 10-19. Defendants also move to dismiss plaintiffs' forfeiture claims, arguing that they followed the plan's terms in using forfeitures to defray administrative costs and employer contributions and that the plan's terms in no way violated ERISA. Id. at 19-28. Finally, they assert that because plaintiffs' failure to monitor claim is derivative and plaintiffs fail to state a claim on the underlying grounds, it must also be dismissed. Id. at 29. Plaintiffs responded, Dkt. # 39, defendants replied, Dkt. # 41, and the motion is now ripe for review.

## II.

When a party moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief can be granted. To survive a motion under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). The Tenth Circuit has interpreted the plausibility requirement to mean that if the allegations contained in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" Robbins v. Okla. ex. rel. Dep't of Hum. Servs., 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting Twombly, 550 U.S. at

570).  The allegations must also "be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim to relief."  Id. (citing Twombly, 550 U.S. at 555-56).  Put differently, for a claim to survive a Rule 12(b)(6) motion, there must be "more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  However, "'mere labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."  Kan. Penn. Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting Twombly, 550 U.S. at 555); see also Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976) ("A motion to dismiss under Fed. Rules Civ. Proc., rule 12(b)(6) admits all well-pleaded facts in the complaint as distinguished from conclusory allegations.").

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Tal v. Hogan, 453 F.3d 1244, 1252 (10th Cir. 2006) (quoting Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999)).  The facts alleged "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555 (citation omitted) (citing 5 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1216 (3d ed. 2004)).  For the purposes of making a dismissal determination, a court must accept as true all well-pleaded allegations in the complaint and construe the allegations in the light most favorable to the claimant.  Iqbal, 556 U.S. at 678-79.

## III.

As a statute, ERISA does not require employers to offer employee benefit plans, but rather for those employers that choose to sponsor benefit plans, it imposes certain duties on those employers as fiduciaries. Lockheed Corp. v. Sprink, 517 U.S. 882, 887 (1996); see also Beuscher v. North Am. Lighting, Inc., No. 24-CV-2076, 2025 WL 1927503, at *4-5 (C.D. Ill. June 30, 2025). Although ERISA guarantees that an employer administering a benefits plan will abide by the duties of prudence and loyalty, among others, exactly how those duties must be discharged depends on the circumstances. Hughes v. Northwestern Univ., 595 U.S. 170, 172 (quoting 29 U.S.C. § 1104(a)(1)(B)); Matney v. Barrick Gold of North Am., 80 F.4th 1136, 1146 (10th Cir. 2023). Plaintiffs assert four claims against defendants as fiduciaries that derive from (1) alleged failure to control the plan's RKA costs and (2) using forfeited funds to defray the company's contribution to the plan before reducing participant RKA fees. Dkt. # 27, ¶¶ 131-59.

The threshold question, which must be answered before addressing either of the alleged actions from which plaintiffs' claims stem, is whether plaintiffs sufficiently allege that defendants acted as fiduciaries. Pegram v. Hedrich, 530 U.S. 211, 226 (2000). Examining first the "text of ERISA's definition of fiduciary," Lockheed Corp., 517 U.S. at 890, ERISA provides that a person is a fiduciary to the extent that he "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its asserts," he "renders investment advice for a fee or other compensation . . . or has authority to do so," or he "has any discretionary authority or discretionary responsibility in the administration of such plan," 29 U.S.C. § 1002(21)(A). Plaintiffs have alleged that defendants, Alliance, the Board, the Committee, and John Does, who were officers, employees, or contractors

acting in a fiduciary capacity, exercised discretionary authority or had a duty to monitor the actions of another defendant during the period at issue. Dkt. # 27, ¶¶ 20, 24, 27, 29. Defendants do not contest that they acted as fiduciaries. See also Dkt. # 28, at 9 (describing Alliance as having "delegated fiduciary the responsibilities of administering the Plan, including monitoring the Plan's fees and service providers, to the Committee"). Courts addressing similar claims have routinely found that both managing RKA fees and allocating forfeitures amount to fiduciary functions. See, e.g., Hutchins v. HP Inc., 737 F. Supp. 3d 851, 860 (N.D. Cal. 2025), ; Rodriguez v. Intuit Inc., 744 F. Supp. 3d 935, 942-43 (N.D. Cal. 2024); McManus v. Clorox Co., No. 23-CV-05325, 2024 WL 4944363, at *4 (N.D. Cal. Nov. 1, 2024); Madrigal v. Kaiser Found. Health Plan, Inc., No. 24-CV-05191, 2025 WL 1299002, at *4 (C.D. Cal. May 2, 2025). Plaintiffs have adequately alleged that defendants were acting as fiduciaries in both managing the RKA fees associated with the plan and deciding how to allocate forfeitures. The Court now turns to whether plaintiffs have alleged sufficient facts to state claims with regard to the management of RKA fees and the decision to allocate forfeitures.

**A.    Recordkeeping and Administrative ("RKA") Fees (Breach of Duty of Prudence)**

Plaintiffs have asserted that the Committee breached is fiduciary duty of prudence by failing to control the plan's RKA fees. ERISA contemplates the likelihood that a fiduciary administering a plan will be faced with "difficult tradeoffs"; therefore, a court analyzing that fiduciary's choices with respect to the duty of prudence "must engage in 'careful, context-sensitive scrutiny of a complaint's allegations' in order to 'divine the plausible sheep from the meritless goats.'" Matney, 80 F.4th at 1146 (quoting Fifth Third Bankcorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014)). In these cases, a court is tasked with determining whether plaintiffs have raised an inference of imprudence

by alleging "a sound basis for comparison—a meaningful benchmark" by which to compare the defendant to a prudent fiduciary. Id. at 1147 (citing Meiners v. Wells Fargo & Co., 898 F.3d 820, 822 (8th Cir. 2018)).  When a price disparity is alleged between the plan at issue and comparator plans, the Tenth Circuit has declared "there is no doubt a claim for breach of ERISA's duty of prudence can be based on allegations that the fees associated with the defined-contribution plan are too high compared to available, cheaper options."  Id. at 1148.  But those cost comparators are only "meaningful" in the specific context, when relevant comparisons that are supported by facts alleged allow a court to draw an inference of imprudence.  Id. at 1148-49.  In other words, plaintiff must allege sufficient facts for a court to find it to be "an apples-to-apples comparison."  Id.

Plaintiffs have alleged that the five plans it provides as comparators, with "similar assets and participants," confirm that "Intrust's RKA fees were excessively high given its lack of experience recordkeeping for large plans and not because of any other reason, such as the type of services it provided the Plan."  Dkt. # 27, ¶¶ 113-14.  Plaintiffs support their claim with the assertion that "it would be inexplicable to say the services provided to the Plan by Intrust were 3½ times more valuable than services provided to similarly sized plans by more experienced recordkeepers than Intrust."  Id. ¶ 114.  Missing from plaintiffs' amended complaint are any factual allegations supporting the conclusion that the types of services provided could not account for the discrepancy in fees.  In Matney, the Tenth Circuit gave examples of factual allegations that might provide support for such a conclusion, such as that "the alternative investment options have similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds."  80 F.4th at 1148 (citing Smith v. CommonSpirit Health, 37 F.4th 1160, 1167 (6th Cir. 2022); Meiners, 898 F.3d at 823).  There the court also made plain that there is no one way for plaintiffs to allege a meaningful

benchmark, as context will necessarily dictate the "content of the duty of prudence." Id. Yet, plaintiffs must still allege sufficient facts to show "that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan." Id. at 1149 (citing Smith, 37 F.4th at 1169; Matousek v. MidAmerican Energy Co., 51 F.4th 274, 279 (8th Cir. 2022)). Here, plaintiffs allege that the comparator recordkeepers "are capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena," but plaintiffs fail to allege that the comparator plans actually did provide the same quality or even the same type of service as Intrust.

Plaintiffs offer a conclusion without the requisite factual basis that the types of services provided could not have accounted for the difference in comparators' fees. The Sixth Circuit in England v. DENSO International America, Inc., 136 F.4th 632 (6th Cir. 2025), affirmed a district court's dismissal of a similar claim, in which plaintiffs alleged that "the disparity between the Plan's recordkeeping fee, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services, cannot be explained by any additional services or the quality of those services, provided by [the recordkeeper] to the Plan." Id. at 635. The court concluded that "nothing in plaintiffs' complaint permits [the court] to reasonably infer a breach of the duty of prudence," as the complaint "provides no details about the specific types of services that the comparator plans received relative to those the DENSO plan received." Id. at 637. Notably, plaintiffs admitted that the comparators provided different levels and qualities of RKA services;[7] however, the court made its

_____

[7] There, the court noted two traits that undermined the finding that the comparator plans created a meaningful benchmark: first, the RKA fees charged varied "considerably" from $25 to $39, and second, the assets managed ranged from $107,625,510 to over $1 billion. England, 136 F.4th at 637.

finding based on plaintiffs' failure to "demonstrate a meaningful benchmark," which left the court "unable to evaluate 'whether [the] fee [was] excessive <u>under the circumstances</u>.'" <u>Id.</u> (quoting <u>Smith</u>, 37 F.4th at 1169) (first alteration in original).  Here, plaintiffs assert that the RKA fees were high because of Intrust's lack of experience and allege that the RKA fees could not have been high for any other reason, including differences in the type of services provided.  Dkt. # 27, ¶ 114.  Without any context for the types of services provided by the comparator plans or by Intrust, the Court is left in the same position as the court in <u>England</u>, unable to discern whether the comparator fees demonstrate a meaningful benchmark in the given context.

As defendants point out, several courts, including the Tenth Circuit, have rejected the theory that all recordkeeping services are fungible and thus all plans inherently offer the same quality and type of service.  Dkt. # 28, at 12 (citing <u>Matney</u>, 80 F.4th at 1148-49; <u>Barrett v. O'Reilley Auto., Inc.</u>, 112 F.4th 1135 (8th Cir. 2024); <u>Singh v. Deloitte LLP</u>, 123 F.4th 88 (2d Cir. 2024)).  In <u>Singh</u>, the Second Circuit held that plaintiffs had not "draw[n] 'apple-to-apple' comparisons even when relying on disclosure documents filed by the Plan and its alleged comparators."  123 F.4th at 95.  There, plaintiffs asserted that "'[t]he services chosen by a large plan do not affect the amount charged by recordkeepers for [the] basic and fungible services' that constitute 'essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power."  <u>Id.</u> at 94-95.  The court found this assertion to be undermined by the fact that the complaint's allegations reflected "a range of recordkeeping fees even among the six large comparator plans, belying the implication that the allegation of a cost disparity alone, without some more consideration of the surrounding context, categorically suggests imprudence."  <u>Id.</u> at 95 (citing <u>Matney</u>, 80 F.4th at 1148).  The Eight Circuit in <u>Barrett</u> used more vivid imagery to depict the same idea.  Discussing the

comparison of bundled plans to à la carte RKA services, it stated: "It would be like trying to compare the costs of two otherwise identical grocery baskets, except one contains filet mignon and the other does not. We would expect the one with the steak to cost more, and the same goes for a plan that offers additional individualized services." 112 F.4th at 1139. Plaintiffs distinguish between the bundled and à la carte services provided by "all national recordkeepers," but they refer to the bundled services provided as "basic and fungible." Dkt. # 27, ¶¶ 71-74. But like the plaintiffs in Singh, the plaintiffs here assert that "the level, number and character of participant services provided by a record keeper have minimal impact upon the costs of providing record keeping." Id. ¶ 76. Plaintiffs attribute the universality of RKA fees to the fact that the scale of "building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large, fixed costs," which are not materially impacted by adding additional plan participants. Id. Although application of the duty of prudence remains context-specific, it is evident that plaintiffs cannot meet their burden by simply alleging that all RKA services are fungible and therefore the fact that comparator plans have lower RKA fees amounts to a breach of the fiduciary duty of prudence.

Plaintiffs argue that they specified and compared similar services provided based on the way they calculated the RKA fees for comparator plans. Specifically, plaintiffs used codes found in the comparator plans' Form 5500s, which they allege "indicat[e] the type of general services performed by the recordkeeper." Dkt. # 27, ¶¶ 100, 107; see also Matousek, 51 F.4th at 279 (describing service codes as explanations for the types of services the recordkeeper provided). Those codes use descriptions such as "15 - Recordkeeping and information management (computing, tabulating, data processing, etc.); 37 - Participant loan processing; 50 - Direct payment from the plan; 63 - Distribution (12b-1) fees; 64 - Recordkeeping fees." Id. ¶ 100 (quoting DEP'T OF TREASURY,

14

INTERNAL REVENUE SERV., INSTRUCTIONS FOR FORM 5500 ANNUAL RETURN/REPORT OF EMPLOYEE BENEFIT PLAN 30 (2023)).  Although these codes itemize the "service/compensation" offered by the recordkeeper in general categories, defendants correctly point out that "every plan has different services" coded.  Dkt. # 28, at 15.  Another court has found that disparities in service/compensation codes for comparator RKA fees "are not fatal to [a plaintiff's] imprudence claim," but it also noted that those disparities may make bare "the implausibility of [p]laintiffs' allegations that the RKA services the [defendants'] [p]lan received are necessarily equivalent to those received by their alleged comparator plans." Dukes v. AmerisourceBergen Co., No. 23-CV-00313, 2024 WL 4282309, at *6 (W.D. Ky. Sep. 24, 2024).  Inconsistent service codes also appear fatal to plaintiffs' comparator arguments in Barrett, in which the court held that simply asserting "without further explanation, that 'the service codes from the . . . Form 5500 show[] that the plan received the same type of service as the comparator plans,'" is "conclusory" and fails to meet the pleading standard required of a motion to dismiss under Rule 12(b)(6).  112 F.4th at 1140.  The court there did, however, acknowledge that in that case if there had "been allegations that 'the services purchased were sufficiently similar to render the comparisons valid,' it might have 'nudged their claim[] across the line from conceivable to plausible." Id. (citations omitted) (first quoting Mator, 102 F.4th at 188, then quoting Twombly, 550 U.S. at 570).

In Schuster v. Swinerton Inc., No. 24-CV-04970, 2025 WL 1069887, at *4 (N.D. Cal. April 8, 2025), the court found that despite discrepancies in comparator plans' codes, plaintiffs sufficiently alleged that the services overlapped.  There, the court distinguished Singh and found that plaintiffs sufficiently alleged that the defendants' RKA services were "comparable to that provided by" the comparator plans. Id. at *5; see also Ramseur v. Lifepoint Health, Inc., No. 24-CV-00994, 2025 WL

2619151, at *3 (M.D. Tenn. Sep. 10, 2025) (finding that plaintiffs plausibly stated their claim given that they used comparators with different but overlapping Form 5500 service codes and that plaintiffs alleged that the defendant "and comparator plans were receiving similar services"); Stewart v. Nextera Energy, Inc., No. 23-CV-81314, 2025 WL 3098085, at *8 (S.D. Fl. Aug. 14, 2025) (finding that plaintiffs sufficiently alleged that comparator plans provided similar services given the allegation that the comparators "received at least the same services as the Plan here"). Here, plaintiffs allege that the comparator recordkeepers are "capable of providing the same quality of service," that many report on Form 5500s using the same service codes, and even that their bundled services offered were both fungible and "routine." Dkt. # 27, ¶¶ 87, 100, 72. Plaintiffs do not, however, allege that the comparator recordkeepers in fact provided the same or even similar services to their respective plans during the years at issue.

Plaintiffs also claim that Intrust's relative inexperience as a recordkeeper as compared to the top ten recordkeepers led to increased RKA costs. Id. ¶¶ 21, 86-88, 101. Plaintiffs acknowledge that "it may not be per se imprudent for a plan to select a recordkeeper with no experience with a plan of this size." Id. ¶ 101. Plaintiffs advance the theory that "recordkeeping expenses are driven by the number of participants in a plan," and a fiduciary administering a plan with a large number of participants has a duty to "take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee." Id. ¶¶ 75 (citing a ECONOMIC SYSTEMS, INC., DEP'T OF LABOR, PENSION & WELFARE BENEFITS ADMINISTRATION, STUDY OF 401(K) PLAN FEES AND EXPENSES (1998)). By extension, a fiduciary seeking to "take[] advantage of its economies of scale to get the best possible record-keeping fees" would be unable to do so "when it utilized a recordkeeper with such limited experience with large plans." Id. ¶ 101. In practice, this means that recordkeepers with experience

16

have already built and already maintain the infrastructure necessary to manage a large plan, which means not only are the fixed costs allocated over the large participant base lower, but also adding new participants to the plan adds only marginal costs. Id. ¶¶ 75, 76. Defendants counter that plaintiffs cite to no requirement that a fiduciary must "select a popular service provider." Dkt. # 28, at 18. The Court agrees with defendants that the choice to engage a recordkeeper with relatively less experience than the top ten services does not, in itself, constitute imprudence. As to plaintiffs' theory regarding the fixed costs associated with engaging recordkeepers with less experience in managing large plans, the Court finds plaintiffs' theory to be too attenuated for it to raise an inference of imprudence.

Finally, plaintiffs fail to move their prudence claim "from possibility to plausibility" by alleging that because defendants failed to complete an RFP at reasonable intervals, defendants acted imprudently. Dkt. # 27, ¶¶ 90-93. Plaintiffs allege that "at least every three to five years as a matter of course" defendants should have solicited RFPs from competing recordkeepers in order to fulfill its duty to beneficiaries. Id. ¶ 91. Although plaintiffs "do not have actual knowledge of the specifics of [d]efendants' decision-making process with respect to the plan," they imply that no RFP was conducted between 2018 and 2023. Id. ¶¶ 97-98. As defendant underscores, in Matney the Tenth Circuit considered this very argument and rejected the notion that, in that case, "[s]imply alleging the Committee needed to conduct regular RFPs does not raise a plausible inference of imprudence." 80 F.4th at 1156. The Supreme Court in Dudenhoeffer stressed that, for a court determining the duty of prudence, "the appropriate inquiry will necessarily be context specific," 527 U.S. at 425; therefore, Matney is limited to the context in which that case was decided on this point. Moreover, defendants in Matney alleged that they renegotiated their RKA fees three times in five years, securing a reduction in fees each time. Matney, 80 F.4th at 1157. In this case, plaintiffs fail to show how the failure to

17

conduct an RFP amounts to imprudence. According to plaintiffs' own allegations, the RKA fees it alleges participants paid decreased over time, going down by $29.10 between 2021 and 2022, and by $80.89 between 2022 and 2023. Dkt. # 27, ¶ 112. Although a decrease in RKA fees is not dispositive of defendants' fulfilling their duty of prudence, plaintiffs' allegation that defendants' failure to solicit proposals to secure lower fees is unavailing.

At bottom, plaintiffs' claim for breach of the Committee's fiduciary duty of prudence with respect to RKA fees fails the "context-specific scrutiny of a complaint's allegations" that the Court must undertake when analyzing a motion to dismiss. Dudenhoeffer, 573 U.S. at 425. The facts, as alleged, do not implicate imprudence on the Committee's part. The Court is therefore left unable to infer that, given the alleged facts, defendants were imprudent in managing account fees. Defendants' motion to dismiss plaintiffs' claim as to the Committee's breach of the fiduciary duty of prudence with respect to controlling the plan's RKA costs should therefore be granted.

 **B. Allocation of Forfeitures (Breach of Duties of Prudence and Loyalty and ERISA's Anti-Inurement Provision)**

Plaintiffs assert claims for breaches of the fiduciary duties of prudence and loyalty as well as ERISA's anti-inurement provision because defendants used forfeited funds to defray their own contributions to the plan before using those funds to reduce participant RKA costs. Under ERISA,

18

the fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).[8]  ERISA further mandates that fiduciaries act "in accordance with the documents and instructions governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter." Id. § 1104 (a)(1)(D).  Inherent within the fiduciary duties of loyalty and prudence is a potential for tension between acting in the sole interest of plan participants and acting in accordance with plan documents.  In those instances, courts have found that the duty to act in accordance with plan documents must yield to the duty to act in the sole interest of the participants and the duty to act prudently.  Dudenhoeffer, 573 U.S. at 422 ("[T]rust documents cannot excuse trustees from their duties under ERISA." (quoting Central States, Se. & Sw. Areas Pension Fund v. Cent. Transp. Inc., 472 U.S. 559, 568 (1985)); Eaves v. Penn, 587 F.2d 453, 459 (10th Cir. 1978); Wright v. Or. Metallurgical Corp., 360 F.3d 1090, 1100 (9th Cir. 2004) ("ERISA requires fiduciaries to comply with a plan as written unless it is inconsistent with ERISA."); McManus, 2024 WL 4944363, at *6 ("While plans under ERISA cannot serve as a shield in cases

---

[8] Courts analyzing alleged breaches of the fiduciary duties of loyalty and prudence, arising out of a fiduciary prioritizing using forfeited funds to reduce matching contributions over defraying RKA fees, frequently analyze these two duties together.  See, e.g., Hutchins, 737 F. Supp. 3d at 862; Middleton v. Amentum Parent Holdings, LLC, No. 23-CV-2456, 2025 WL 2229959, at *14 (D. Kan. Aug. 5, 2025); McManus v. Clorox Co., No. 24-CV-5425, 2024 WL 4944363, at *6 (N.D. Cal. Nov. 1, 2024); Cain v. Siemens Corp., No. 24-CV-08730, 2025 WL 2172684, at *3-5 (D.N.J. July 31, 2025); Wright v. JPMorgan Chase & Co., No. 25-CV-00525, 2025 WL 1683642, at *3-5 (C.D. Cal. June 13, 2025); Sievert v. Knight-Swift, 780 F. Supp. 3d 870, 876-79 (D. Az. 2025); Barragan v. Honeywell, No. 24-CV-04529, 2025 WL 5165330, at *4-5 (D.N.J. Dec. 10, 2024).  Although the duties of loyalty and prudence are distinct, compare 29 U.S.C. § 1104(a)(1)(A), with id. § 1104(a)(1)(B), courts have often paired their analyses of these claims because they reach their determinations on substantially similar bases. See supra.  Similarly, the Court analyzes the claims together to avoid repetition.

where administrators violate ERISA's terms, the purpose of the statute is to 'protect contractually defined benefits' and to assure 'reliance on the face of written plan documents.'" (quoting U.S. Airways, Inc. v. McCutchen, 569 U.S. 88, 101 (2013))).

Both parties agree that the plan documents authorize defendants to allocate forfeitures to reduce employer contributions. Dkt. # 27, ¶¶ 56-57; Dkt. # 28, at 20-22. The germane language of the plan is permissive, in that "the Committee may use forfeitures to 'pay Plan expenses or reduce Employer contributions, at the discretion of the Company." Dkt. # 27, ¶ 57 (emphasis added) (quoting Dkt. # 28-2, at 38). Plaintiffs add a gloss to this language, however, by reading the text of a 2022 auditor's report attached to a Form 5500 into the plan documents, which requires forfeitures to first be used to defray RKA fees and then to be used to offset defendants' own contributions. Dkt. # 27, ¶ 57. They do not view the auditor's report as a document that must trump the plan document, but rather they use it to "demonstrate[] [d]efendants' official commitment to exercise their discretion in a way that best adheres to their fiduciary duties of loyalty and prudence." Dkt. # 39, at 24. In other words, plaintiffs agree that the plan documents permit the use of forfeiture funds to defray employer contributions. But plaintiffs contend that in using forfeitures to pay their own contributions before paying RKA fees, defendants are in violation of ERISA's duties of prudence and loyalty.

Plaintiff's theory on this point is not novel. "[A] growing number of district court decisions" have already considered and rejected plaintiffs' theory of liability under ERISA. See, e.g., Cain v. Siemens Corp., No. 24-CV-08730, 2025 WL 2172684, at *4 (D.N.J. July 31, 2025); Barragan v. Honeywell, No. 24-CV-04529, 2025 WL 5165330, at *4-5 (D.N.J. Dec. 10, 2024); Hutchins, 737 F. Supp. 3d at 862; Wright v. JPMorgan Chase & Co., No. 25-CV-00525, 2025 WL 1683642, at *5 (C.D. Cal. June 13, 2025); Dimou v. Thermo Fischer Sci. Inc., No. 23-CV-1732, 2025 WL 2611240,

at *9 (S.D. Cal. Sep. 9, 2025); Bozzini v. Ferguson Enters. LLC, No. 22-CV-5667, 2025 WL 1547617, at *2 (N.D. Cal. May 29, 2025); Madrigal, 2025 WL 1299002, at *4-5; Sievert v. Knight-Swift, 780 F. Supp. 3d 870, 877-78 (D. Az. 2025); McWashington v. Nordstrom, No. 24-CV-1230, 2025 WL 1736765, at *13-15 (W.D. Wash. June 23, 2025); Estay v. Ochsner Clinic Found., No. 25-CV-00507, 2025 WL 2644782, at *4-5 (Sep. 15, 2025); Armenta v. WillScot Mobile Mini Holdings Co., No. 25-CV-00407, 2025 WL 2645518, at *4-5 (D. Az. Sep. 15, 2025); Middleton v. Amentum Parent Holdings, LLC, No. 23-CV-2456, 2025 WL 2229959, at *11-17 (D. Kan. Aug. 5, 2025). Courts have repeatedly held that ERISA permits the use of forfeiture funds for employer contribution matching. However, a small minority of courts have found that when a plan's terms permitted the fiduciary discretion and it chose to reduce its own non-elective contributions instead of defraying plan fees, it violated the duties of loyalty and prudence. McManus, 2025 WL 732087, at *3; Perez-Cruet v. Qualcomm Inc., No. 23-CV-1890, 2024 WL 2702207, at *1 (S.D. Cal. May 24, 2024); Rodriguez, 744 F. Supp. 3d at 944.

Plaintiffs' theory suffers from several infirmities that other courts have enumerated. First, the court in Hutchins characterized plaintiff's theory, that as a matter of law fiduciaries breach the duties of loyalty and prudence when they use forfeitures to reduce their own contributions prior to RKA fees, as "in tension with the Supreme Court's analysis in Dudenhoeffer." 737 F. Supp. 3d at 862. Whereas Dudenhoeffer "emphasizes that the plausibility of allegations of breach of fiduciary duty should consider the context and circumstances of the fiduciary's actions," plaintiff's theory "would require any fiduciary to use forfeited amounts to pay administrative costs regardless of any such context or circumstances." Id.; see also Wright, 2025 WL 168642, at *5. The breadth of plaintiffs' argument is therefore implausible in light of binding Supreme Court precedent.

Next, plaintiffs' theory seeks to impose liability that goes beyond ERISA's statutory framework. Again, in <u>Hutchins</u> the court found that "ERISA does not mandate what benefits an employer must provide under a plan and does no more than protect the benefits which are due to an employee under a plan." 737 F. Supp. 3d at 863. It concluded that the plaintiff's interpretation of ERISA was so broad that it was tantamount to asking the court to create a benefit in the form of defrayed administrative costs. <u>Id.</u> Yet, courts agree that ERISA creates no duty for a fiduciary to maximize profits or benefits, only a duty to ensure that participants receive the benefits promised to them. <u>See, e.g.</u>, <u>id.</u>; <u>Estay</u>, 2025 WL 2644782, at *4; <u>Wright</u>, 360 F.3d at 1100.

Finally, plaintiffs' theory would disturb decades of policy built on Congress's and the Department of the Treasury's understanding that ERISA permits plan administrators to use forfeitures to reduce their contributions before defraying RKA fees. <u>See, e.g.</u>, <u>Hutchins</u>, 737 F. Supp. 3d at 861-64; <u>Cain</u>, 2025 WL 2172684, at *5; <u>Dimou</u>, 2024 WL 4508450, at *9; <u>McManus</u>, 2024 WL 4944363, at *6. For example, Treasury has proposed new regulations to clarify that under ERISA, the practice is permitted. <u>McManus</u>, 2024 WL 4944363, at *6 (citing Use of Forfeitures in Qualified Retirement Plans, 88 Fed. Reg. 12283 (proposed Feb. 27, 2023)). <u>But</u> <u>see</u> <u>Perez-Cruet</u>, 2024 WL 2702207, at *7 (underscoring that the regulation is merely a proposal and does not carry the force of law, bearing little on whether plaintiff's claim is plausible). From the Secretary of Labor's perspective, by requiring fiduciaries to allocate funds in this way, the boundaries between settlor and fiduciary may become blurred, such that the fiduciary impermissibly impedes on the settlor's functions to increase or allot contributions. Brief for the U.S. Secretary of Labor as Amicus Curiae Supporting Defendant Appellee at 18, Hutchins v. HP Inc., No. 23-CV-5875 (9th Cir. July 9, 2025).

Even if the Court considers plaintiffs' assertions at face value, they fail to meet the pleading standard necessary to overcome the motion to dismiss. As discussed, several courts have found that allocating forfeitures to employer contributions violates the duties ERISA imposes on fiduciaries. In analyzing whether a decision was made with a conflict of interest, a court should consider the motivation for the fiduciary's decision. McManus, 2025 WL 732087, at *3; Lauderdale v. NFP Ret., Inc., No. 21-CV-00301, 2024 WL 751005, at *23 (C.D. Cal. Feb. 23, 2024) ("When assessing whether a fiduciary has complied with ERISA's duty of loyalty, what matters is why the defendant acted as he did." (emphasis in original)). Likewise, in determining whether a decision was made prudently, a court should examine the "thoroughness of the investigation into the merits of the transaction." McManus, 2025 WL 732087, at *3 (quoting Tibble v. Edison Int'l, 843 F.3d 1187, 1197 (9th Cir. 2016)). In McManus, the court acknowledged that, although plaintiff's factual allegations were sparse—such as failing to undertake investigations as to best options for the plan or failing to consult with an independent non-conflicted decision-maker—they were sufficient to meet the Rule 12(b)(6) standard with respect to both "motivation for loyalty claims and the thoroughness of an investigation for prudence claims." 2025 WL 732087, at *4. Here, however, plaintiffs allege that the forfeitures were used to both reduce Alliance's contributions and the RKA fees, that defendants placed their interests above those of the plan and participants, and that as a result the plan incurred expenses it would not have otherwise. Dkt. # 27, ¶¶ 120-30. As with plaintiffs' claims related to the RKA fees, plaintiffs neglect to allege anything beyond a bald conclusion. Under the Rule 12(b)(6) pleading standard established by Twombly, the Court cannot accept "mere labels and conclusions" without "specific factual allegations to support each claim." Twombly, 550 U.S. at 555; Kan. Penn., 565 F.3d at 1214. The Court cannot conclude that defendants breached either the fiduciary duty of

prudence or the fiduciary duty of loyalty by utilizing forfeited funds for reducing employer contributions before defraying all RKA costs. Defendants' motion to dismiss these claims should be granted.

Plaintiffs also raise a claim related to forfeitures under ERISA's anti-inurement provision, which states that "the assets of a pension shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to the participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). The Supreme Court has stated that the language of the anti-inurement provision "focuses exclusively on whether fund assets were used to pay pension benefits to plan participants, without distinguishing . . . between assets that make up a plan's surplus as opposed to those needed to fund the plan's benefits." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 442-45 (1999); see also Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 22 (2004). Other courts have examined the anti-inurement provision's legislative history, inferring it was created out of "congressional concern over the wrongful diversion of trust assets and the administrative integrity of benefit plans." Wolk v. Unum Life Ins. of Am., 186 F.3d 352, 358 (3d Cir. 1999) (quoting Prudential Ins. Co. v. Doe, 76 F.3d 206, 209 (8th Cir. 1996)). Courts examining this issue, which is often raised in conjunction with claims for breaches of the duties of prudence and loyalty, have found "[a]llegations of 'indirect' or 'incidental' benefits to an employer are insufficient to state a claim under the anti-inurement provision." Hutchins, 737 F. Supp. 3d at 864 (citing Krohnengold v. N.Y. Life Ins. Co., No. 21-CV-1778, 2022 WL 3227812, at *10 (S.D.N.Y. Aug. 10, 2022); Hughes Aircraft, 525 U.S. at 445; Holliday v. Xerox Corp., 732 F.2d 548, 551 (6th Cir. 1984)).

The Tenth Circuit found in <u>Maez v. Mountain States Telephone & Telephone Inc.</u>, 54 F.3d 1488 (10th Cir. 1995), that because plaintiffs did not allege that any plan funds were reverted, diverted, or paid out of the plan, plaintiffs had failed to make a viable claim with regard to a violation of ERISA's anti-inurement provision.  <u>Id.</u> at 1506.  In that case, the court adopted the Eleventh Circuit's ruling in <u>Aldridge v. Lily-Tulip, Inc. Salary Retirement Plan Benefits Committee</u>, 954 F.2d 587 (11th Cir. 1992), holding that the anti-inurement provision "can only be violated if there has been a removal of plan assets for the benefit of the plan sponsor or anyone other than the plan participants." <u>Id.</u> at 692 n.6; <u>see also</u> <u>Madrigal</u>, 2025 WL 1299002, at *6 ("Plaintiff does <u>not</u> allege that any of the forfeited assets at issue ever left the Plan[, which is] sufficient to foreclose her claim."); <u>Barragan</u>, 2024 WL 5165440, at *6 ("As these forfeited amounts do not leave the Plan and are used to satisfy Honeywell's obligations according to the Plan's language, the Court finds Honeywell is not acting in violation of the anti-inurement provision.").  Plaintiffs state that the company used forfeited funds "in order to save itself millions of dollars that the Company would otherwise have to contribute to the plain."  Dkt. # 27, ¶ 150.  They do not state that any forfeited fees left the plan.  Applying the minimum pleading requirement for jurisdiction established in <u>Maez</u>, that the forfeited funds had to have left the plan for an anti-inurement provision claim to be valid, the Court finds that plaintiffs fail to state a claim upon which relief can be granted with respect to their anti-inurement claim, and defendants' motion to dismiss this claim should be granted.

## C.    Failure to Monitor Claim

Plaintiffs finally allege that defendants failed to monitor other fiduciaries and service providers.  Dkt. # 27, ¶¶ 153-59.  Both parties agree that this claim is derivative of the other claims that have been raised and are being dismissed.  Dkt. # 28, at 29; Dkt. # 39, at 32.  Given that all other

of plaintiffs' claims are subject to dismissal, the Court must also dismiss this claim.  See Dimou, 2024 WL 4508450, at *11; Estay, 202 WL 2644782, at *7.

**D.    Leave to Amend.**

Plaintiffs ask the Court to deny the motion to dismiss or, in the alternative, grant leave to amend their amended complaint to remedy the deficiencies identified.  Dkt. # 39, at 32.  With respect to a motion seeking leave to amend, Federal Rule of Civil Procedure 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave," the latter of which should be given freely "when justice so requires."  Ordinarily, leave to amend should be granted in the absence of "undue delay, bad faith or dilatory motive on the part of the movant." Foman v. Davis, 371 U.S. 178, 182 (1962).  However, leave to amend should be denied when the proposed amendment would be futile.  Bylin v. Billings, 568 F.3d 1224, 1229 (10th Cir. 2009).  The liberal approach to granting leave contemplated by Rule 15 is intended to "provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." BLOM Bank SAL v. Honickman, 145 S. Ct. 1612, 1621 (2025) (quoting 6 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1471 (3d ed. 2010)).  Whether to permit a party leave to amend is committed to the sound discretion of the court.

The Court has already allowed plaintiffs the opportunity to amend their complaint once per a joint motion by the parties.  Dkt. # 26, at 1; Dkt. # 24, at 2.  Plaintiffs now seek leave to amend once again.  Dkt. # 39, at 32.  With respect to the forfeiture claims, plaintiffs pursue a tentative theory that is unsupported by present law.  See supra.  The Court finds that leave to amend as to plaintiffs' forfeiture claims would be futile.  However, as to plaintiffs' claim for the breach of the duty of prudence related to the RKA fees, the Court finds that plaintiffs' might be able to plausibly allege a

claim if they were to sufficiently allege that Intrust, in fact, provided the same RKA services as those provided by the comparator plans. Conditional leave to amend should therefore be granted as to RKA fees claim only.

      **IT IS THEREFORE ORDERED** that defendants' motion to dismiss (Dkt. # 28) is **granted** as to all of plaintiffs' claims.

      **IT IS FURTHER ORDERED** that plaintiffs' request for leave to amend their amended complaint (Dkt. # 39, at 32) is **granted in part** as to plaintiffs' claim against the Committee related to RKA fees, if they can meet the above-referenced pleading standard; it is **denied in part** as to plaintiffs' claims related to defendants' use of plan forfeitures. Any second amended complaint shall be filed no later than **January 12, 2026**. If no second amended complaint is filed by that date, a judgment of dismissal will be entered.

      **DATED** this 9th day of December 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE