**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) JOSEPH BREWER, and<br>(2) JOSHUA CHUCK and<br>(3) JASON MOODY, and individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>(1) ALLIANCE COAL, LLC, and<br>(2) THE BOARD OF DIRECTORS OF ALLIANCE RESOURCE MANAGEMENT GP, LLC, and<br>(3) THE ADMINISTRATIVE COMMITTEE OF ALLIANCE RESOURCE MANAGEMENT GP, LLC, and<br>(4) JOHN DOES 1-30,<br><br>Defendants. | ) | **Civil Action No.: 24-cv-00406-CVE-SH** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................................1

II. FACTS ........................................................................................2

A. Background on the RKA Industry and Marketplace ........................................................................................2

B. Defendants' Imprudent Processes ........................................................................................3

C. Significant New Allegations ........................................................................................6

III. ARGUMENT ........................................................................................7

A. Standard of Review ........................................................................................7

B. The Plan's Services Rendered for the Fees Paid are Adequately Alleged ........................................................................................9

C. The Meaningful Comparisons Must Be Viewed As A whole ........................................................................................12

1.The Services are Comparable ........................................................................................13

2. The Comparator Plans are Sufficiently Similar ........................................................................................16

3. The Plan Compared to Itself is Meaningful ........................................................................................19

D. The Fees Calculations are Comparable ........................................................................................21

E. Plaintiffs' Supporting Theories Infer Imprudent Processes ........................................................................................23

F. Plaintiffs' Duty to Monitor Claim is Plausible ........................................................................................25

IV. CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 16

*Barrett v. O'Reilly Auto., Inc.*,
112 F.4th 1135 (8th Cir. 2024) ... 11, 16

*Braden v. Wal mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ... *Passim*

*Coyer v. Univar Sols. USA Inc.*,
No. 22-CV-0362, 2022 WL 4534791 (N.D. Ill. Sept. 28, 2022) ... 14, 18

*Cunningham v. Cornell Univ*.,
604 U.S. 693 (2025) ... 8

*Daggett v. Waters Corp*.,
731 F. Supp. 3d 121 (D. Mass. 2024) ... 15

*Dukes v. AmerisourceBergen Corp*.,
No. 23-cv-313, 2024 WL 4282309 (W.D. Ky. Sept. 24, 2024) ... 13, 22

*England v. DENSO Int'l Am. Inc*.,
136 F.4th 638 (6th Cir. 2025) ... 13, 15, 16, 18

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ... 8

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ("*Hughes I*") ... *Passim*

*Hughes v. Nw. Univ*.,
63 F.4th 615 (7th Cir. 2023) ("*Hughes II*") ... *Passim*

*Kong v. Trader Joe's Co*.,
No. 20-cv-56415, 2022 WL 1125667 (9th Cir. Apr. 15, 2022) ... 11

*Kruchten v. Ricoh USA, Inc*.,
No. 23-cv-1928, 2024 WL 3518308 (3d Cir. July 24, 2024) ... 14

*Lopez v. Embry-Riddle Aeronautical Univ., Inc*.,
No: 22-cv-1580, 2023 WL 7129858 (M.D. Fla. July 12, 2023) ... 11, 12

*Mateya v. Cook Grp. Inc.*,
No. 22-cv-1271, 2023 U.S. Dist. LEXIS 124838 (S.D. Ind. June 16, 2023) ...................... 19, 23

*Matney v. Barrick Gold of N. Am.*, , 7
80 F.4th 1136 (10th Cir. 2023) ..................................................................................... *Passim*

*Mator v. Wesco Distribution, Inc.*,
102 F.4th 172 (3d Cir. 2024) ........................................................................................ *Passim*

*Matousek v. MidAmerican Energy Co*.,
51 F.4th 274 (8th Cir. 2022) ............................................................................................... 12

*Miller v. Pfizer, Inc*.,
No. 23-CV-594, 2024 WL 6968817 (W.D. Mich. Oct. 17, 2024) ........................................... 19

*Moore v. Humana, Inc*.,
No. 21-cv-232, 2022 WL 20766504 (W.D. Ky. Dec. 2, 2022) ................................... 19, 20, 22

*Navajo Nation v. Urb. Outfitters, Inc*.,
935 F. Supp. 2d 1147 (D.N.M. 2013) ..................................................................................... 9

*Parmer v. Land O'Lakes, Inc*.,
518 F. Supp. 3d 1293 (D. Minn. 2021) ................................................................................ 11

*Peeler v. Bayada Home Health Care, Inc*.,
No. 24-CV-00231, 2026 WL 208630 (W.D.N.C. Jan. 27, 2026) ............................................ 23

*Perkins v. United Surgical Partners,*
No. 23-cv-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024) ........................................ *Passim*

*Ramos v. Banner Health*,
No. 15-cv-2556, 2017 WL 4337598 (D. Colo. Sept. 29, 2017) ............................................. 10

*Ramos v. Banner Health*,
461 F. Supp. 3d 1067 (D. Colo. 2020),
*aff'd*, 1 F.4th 769 (10th Cir. 2021 ..................................................................................... 24

*Ramseur v. Lifepoint Health, Inc*.,
No. 24-cv-00994, 2025 WL 2619151 (M.D. Tenn. Sept. 10, 2025) .................................. 16, 18

*Sacerdote v. New York Univ*.,
9 F.4th 95 (2d Cir. 2021) ...................................................................................................... 9

*Schuster v. Swinerton Inc*.,
No. 24-cv-04970, 2025 WL 1069887 (N.D. Cal. Apr. 8, 2025) ............................................. 15

*Sealy v. Old Dominion Freight Line, Inc.*,
No. 23-CV-819, 2024 WL 2212905 (M.D.N.C. May 16, 2024) .................................. 12, 17, 20

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024) .......................................................................... 15, 16, 19, 23

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ............................................................................................ 12

*Stewart v. Nextera Energy, Inc.*,
No. 23-cv-81314, 2025 WL 3098085 (S.D. Fla. Aug. 14, 2025) ........................................ 13

*Sugar v. Tackett*,
No. 20-cv-00331, 2021 WL 5867951 (D.N.M. Dec. 10, 2021) .............................................. 9

*Sweda v. Univ. of Pennsylvania*,
923 F.3d 320 (3d Cir. 2019) ........................................................................... 16, 17, 18

*Terraza v. Safeway Inc.*,
2019 WL 1589979 (N.D. Cal. Mar. 6, 2019) ..................................................................... 21

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015) .......................................................................................................... 7, 8

*Wake Forest Univ. Baptist Med. Ctr., Bd.*,
629 F. Supp. 3d 352 (M.D.N.C. 2022) .............................................................................. 23

**Other Sources**

Employee Retirement Income Security Act of 1974 ("ERISA") ......................................Passim

Plaintiffs respectfully submit this Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, Dkt. 63 (hereinafter "MTD").

## I. INTRODUCTION

"[T]he Tenth Circuit has declared 'there is no doubt a claim for breach of ERISA's duty of prudence can be based on allegations that the fees associated with the defined-contribution plan are too high.'" Dkt. 58 ("Order"), at 11 (quoting *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023)).[1] Rather than just alleging excessive recordkeeping and administrative ("RKA") fees alone, "[t]he gravamen of the complaint is that [defendants] failed adequately to evaluate" the Plan's fees, marketplace, and quality of services obtained. *Braden v. Wal mart Stores, Inc.*, 588 F.3d 585, 598-90 (8th Cir. 2009).

The SAC cures the deficiencies this Court found in the prior complaint and unequivocally satisfies *Matney*. Plaintiffs include robust new comparisons for the RKA claim, including detailed allegations and the Plan's own fee history, and the exact services offered by new Comparator Plans. *See* Dkt. 59, Second Amended Complaint ("SAC"). The SAC sufficiently infers ongoing imprudence and excessive fees when properly reading the "allegations as a whole" and viewing them in the light most favorable to Plaintiffs. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) ("*Hughes I*") (reversing dismissal in an excessive RKA fee case). Indeed, *every* appellate court has held, in one way or another, that the service codes and fee amounts derived from annual Department of Labor ("DOL") Form 5500s can plausibly demonstrate comparable fees in relation to services rendered.

Defendants raise legally and factually meritless arguments against the SAC. Defendants: (1) misconstrue Tenth Circuit precedent; (2) misconstrue this Court's prior holdings; (3) ignore major

[1] All undefined terms herein shall have the same meaning ascribed in the Order.

differences between the SAC and FAC; (4) refile the same excerpts and fee disclosures that Plaintiffs have already established do not contradict the complaint; and (5) misrepresent Plaintiffs' fee calculations. Defendants' misrepresentations are nothing more than premature factual disputes warranting discovery, not dismissal.

Defendants' attempts to explain away the excessive fees are readily refuted by reading the excerpts that Defendants materially misrepresent. For instance, Defendants' attachments demonstrate that the trustee and other fees are ***not*** included in the RKA fee amounts in the Form 5500s, and Defendants conveniently omit that the Plan paid additional hourly fees ***on top*** of the base fees. Further, simple math demonstrates that any offset due to forfeitures was so inconsequential that ***the Plan was still paying several times more than other plans***. Defendants' exhibits also show that the Comparator Plan's indirect compensation did not raise their actual RKA fees paid, let alone by enough to match the Plan's exorbitant fees.

## II. FACTS

Plaintiffs lack access to pertinent material related to fiduciary conduct such as fee disclosures provided to fiduciaries by service providers and other information, meeting minutes, benchmarking, negotiations, and requests for proposals ("RFPs"). *Id.*, ¶¶ 75-84. Defendants previously denied Plaintiffs' request for this information. *Id.*, ¶ 81. For purposes of the SAC, Plaintiffs have drawn reasonable inferences regarding Defendants' processes based on numerous public sources. *Id.*, ¶ 84.

### A. Background on the RKA Industry and Marketplace

"Recordkeeping" is a catchall term for the suite of RKA services that are provided to all plans. *Id.*, ¶ 56. This includes a bundle of Plan wide services that are offered for one price, as well as separate, additional (or "ad hoc") services whose fees are based on individualized usage. *Id.*, ¶¶

56-60. The SAC explains how the quality of these services is the same amongst recordkeepers due to the technologies they invest in. *Id*., ¶¶ 62-63, 72. The cost of providing RKA services depends on the number of participants in a plan, where plans with large numbers of participants can leverage economies of scale by negotiating for a lower per participant fee because the recordkeeper allocates fixed costs over a larger participant base. *Id*., ¶¶ 61-66. Plaintiffs support their allegations that pricing is driven by participant size with a DOL study and industry reports. *Id*., ¶¶ 61, 84, 91.

It is industry standard for fiduciaries to conduct RFPs at least every three to five years or more frequently if a plan experiences an increase in fees or the fees are above market rates. *Id*., ¶ 77. One study stated that more than half of the plan sponsors responded that they "are likely to conduct a search for [a] recordkeeper within the next two years" even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper." *Id*., ¶ 78.

**B. Defendants' Imprudent Processes**

Plaintiffs' allegations regarding Defendants' imprudent conduct must be put in proper context. The few participant disclosures attached to the MTD confirm the validity of the fees listed in the SAC. For example, under the section labeled "Participant Recordkeeping Service Fee" the disclosures provide that there is a "per participant" *base fee in addition to services being $100.00 per hour*, *not* including "trustee fees" or "individual expenses" which are listed under separate sections of the disclosure. *See* Dkt. 63-7 (2020 Participant Fee Disclosure), at 3-4; Dkt. 63-8 (2021 Participant Fee Disclosure), at 3-4; Dkt. 63-9 (2022 Fee Disclosure) at, 3-4. The MTD omits the hourly portion of the fees. The Fee Disclosures confirm that the RKA fees were *above* the base fees, but not the exact amount given the hourly amounts which would be incurred throughout the year. The Form 5500s report the total, exact fees (after the hours incurred). *See* SAC, ¶¶ 95, 103 n.20. Notably, INTRUST, as the recordkeeper, filled out the Form 5500s. *Id.*, ¶ 57.

Further, the excerpts of the fee agreements submitted by Defendants, which are not referenced in the SAC, appear to be incomplete, particularly because they only show "Schedule B." However, even the partial documents confirm that the "Trustee & Custodial Fee Schedule" is separate from the "Plan Administration & Recordkeeping Fee Schedule." Dkt. 28-19. None of Defendants' exhibits offer any indication that the quality or type of services was more than the basic services alleged in the SAC. Crucially, *the codes for "Custodial" services (18 and 19) and "Trustee" services (20 and 21) are not listed in Schedule C section* of the Form 5500s where the services are listed and were thus not included in the SAC's calculation of RKA fees.[2]

At all times during the Class Period, the Plan had had between $440 and $640 million in assets under management, and between 3,711 and 4,650 participants. SAC, ¶¶ 5, 6. The Plan's large size gave it tremendous bargaining power for lower fees. The fact that the Plan paid the relatively same amount of high fees from 2018 to 2024, while the marketplace was experiencing a decrease in fees, and the Plan's services and participant count remained the same, there is little to suggest that Defendants conducted an RFP, or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better pricing from other recordkeepers given that the market for recordkeeping is highly competitive. *Id.*, ¶ 89.

Prior to 2014, the Plan's recordkeeper was NestEgg Consulting, Inc. ("NestEgg")[3] and the Plan's RKA fee was approximately $50 per person. *Id.*, ¶ 50. From 2014 through 2024, the number of Plan participants remained constant. *Id.*, ¶ 52. In the first year following the switch to INTRUST Bank, N.A. ("INTRUST"), the RKA fee increased almost three-fold from $49.78 to $134.90.

---

[2] *See* www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf at 29, accessed Mar. 2, 2026.

[3] Defendants state NestEgg was an affiliate of INTRUST. *See* MTD at 3 n.3, The fact that the two entities are affiliates makes an even more compelling case that the Plan received the same services prior to 2014 and post 2014 yet after 2014 paid more for RKA services.

Based on the fee disclosures, these fees plausibly included fees incurred as a result of hourly billing by INTRUST. Yet, the number of Plan participants increased by only 106 participants, (less than 3%). *Id*. In 2016, the number of participants decreased from 4,830 to 3,974, but fees **increased** from $198.99 in 2015 to $211.05 in 2016 – **more than four times** the RKA fee prior to the change in recordkeeper. *Id*., ¶ 53. The fee increase was a major red flag that Defendants ignore, especially because, at the same time, the marketplace's median RKA fees began **dropping** precipitously according to the NEPC study. *Id*., ¶¶ 53, 110. The per participant fees were as follows:

| Year | Participants | Plan Assets | Provider | RKA Costs | $PP | Service Codes |
|---|---|---|---|---|---|---|
| 2012 | 4,624 | $300,355,435 | NestEgg | $229,880 | **$49.71** | 15 37 50 64 |
| 2013 | 4,730 | $366,678,143 | NestEgg. | $235,440 | **$49.78** | 15 37 50 64 |
| 2014 | 4,847 | $400,113,038 | INTRUST | $653,848 | **$134.90** | 15 37 50 63 64 |
| 2015 | 4,830 | $412,562,283 | INTRUST | $961,136 | **$198.99** | 15 37 50 63 64 |
| 2016 | 3,974 | $409,107,044 | INTRUST | $838,711 | **$211.05** | 15 37 50 63 64 |
| 2017 | 3,905 | $466,588,166 | INTRUST | $1,034,010 | **$264.79** | 15 37 50 63 64 |
| 2018 | 4,213 | $448,077,261 | INTRUST | $685,046 | **$162.60** | 15 37 50 63 64 |
| 2019 | 4,271 | $528,563,664 | INTRUST | $943,653 | **$220.94** | 15 37 50 63 64 |
| 2020 | 3,711 | $499,670,148 | INTRUST | $791,714 | **$213.34** | 15 37 50 63 64 |
| 2021 | 3,828 | $552,887,173 | INTRUST | $796,837 | **$208.16** | 15 37 50 63 64 |
| 2022 | 4,225 | $476,692,867 | INTRUST | $756,538 | **$179.06** | 15 37 50 63 64 |
| 2023 | 4,492 | $560,487,347 | INTRUST | $440,964 | **$98.17** | 15 37 50 63 64 |

*Id*., ¶¶ 50-55.

The RKA services provided by NestEgg and INTRUST remained identical through at least 2023: 15 (Recordkeeping and information management), 37 (Participant loan processing), 50 (Direct payment), and 64 (Recordkeeping fees). *Id*., ¶¶ 55, 86. The only change is the addition of

Code 63 that that signifies "eligible indirect compensation" which is a fee *structure* – not a service. *Id.*, ¶ 95. None of the services listed are out of the ordinary of the services other national recordkeepers provide. *Id*. Any fees associated with other ancillary services would be negligible because it is on individualized use basis instead. *Id*.

Lastly, although Defendants applied some forfeited plan assets ("forfeitures") to reduce administration costs, these amounts were negligible, and even deducting them from the participant count still demonstrates that the fees paid by participants were astronomical. *See* Dkt. 32, First Amended Complaint ("FAC"), ¶ 127.[4]

### C. Significant New Allegations

The Plan compared to itself (or, INTRUST compared to NestEgg) is an in-depth comparison that was not included in the FAC. The SAC also includes several new "Comparator Plans" for each year that were selected based on similar size and services as the Plan. *Id.*, ¶ 103. Importantly, the SAC now includes the Form 5500 service codes for each of the Comparator Plans. *C.f.* SAC, ¶ 103; FAC ¶ 112. Recall, codes 15 / 64 are duplicative for recordkeeping, and Codes 50 / 63 are not services but instead types of fees, so while some plans may not have one of these exact codes, they still received the same service as the Plan. The calculation of "fees" for the Plan and Comparator Plans is "consistent" using the "amounts reported on Schedule C of the Plan's 5500s" where "no indirect costs are reported." SAC, ¶ 93 n.16. The Comparator Plans also had more experienced recordkeepers with the technology to offer at least the same quality as INTRUST. *Id.*, ¶¶ 63, 72. The Comparator Plans demonstrate a range of reasonable fees each year, but even the *highest* paying comparator, (the J. Walter Thompson Company Profit Sharing and

[4] For example, using the amount of forfeitures divided by the participant count (*see* FAC, ¶ 127) for amounts) and deducting that amount from the per participant fee still resulted in participants paying $130.44 in 2019, $132.72 in 2020, and $106.03 in 2021.

Matched Savings Plan), paid $67.84 for more services in 2019 while the Plan paid ***$220*** for less services. *See id*., ¶ 103. The aggregate of the chart of Comparator Plans shows that the Plan's $169.87 average fee from 2018 to 2024 is ***more than three times*** the average fee of $48.46 from 2018 to 2024 for the 35 Comparator Plans. *See* SAC, ¶ 104.[5] It would be incredulous if the services provided to the Plan by INTRUST were three times more valuable than services provided by NestEgg (apparently the same Company as INTRUST) and compared to similarly sized plans with more experienced recordkeepers than INTRUST. *Id*., ¶¶ 53, 105-07. The Plan should have been able to obtain fees in the $49 range, based on the Comparator Plans and the range of fees paid to NestEgg. *Id*., ¶ 107. To reiterate, the Plan disclosures show that the Plan paid more that the base rate Defendants claim.

## III. ARGUMENT

### A. Standard of Review

ERISA fiduciaries "ha[ve] a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015). "Fiduciaries must also consider a plan's 'power ... to obtain favorable investment products[.]'" *Id*., at 328–29 (citation omitted). This applies to RKA fees. *See Matney*, 80 F.4th at 1157 ("we accept the allegation that administrative fees should decrease as a Plan size increases").

"For the purposes of making a dismissal determination, a court must accept as true all well-pleaded allegations in the complaint and construe the allegations in the light most favorable to the claimant." Order at 8; *see also Matney*, 80 F.4th at 1144, 1146. Courts reviewing ERISA

---

[5] Of the 35 Comparator Plans, all but three plans are within 25% of the Plan's participant count (and often closer). Two of the plans that were slightly smaller than 25% of the Plan were in 2024, when Defendants aver the company paid plan expenses. This 25% similar participant range would be: 3160- 5266 in 2018, 3203-5339 in 2019, 2783-4639 in 2020, 2871-4785 in 2021, 3169-5281 in 2022, 3369-5615 in 2023, and 3488-5813 in 2024.

complaints must "[]evaluate the allegations as a whole" using a "context specific" approach. *Hughes I.*, 595 U.S. at 177. ERISA's "holistic approach," to evaluating complaints means that "[t]he complaint should not be 'parsed piece by piece to determine whether each allegation, in isolation, is plausible.'" *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 190 (3d Cir. 2024) (citation omitted); *see also Braden*, 588 F.3d at 594 (same).

In ERISA cases "it is sufficient for a plaintiff to plead facts indirectly showing" imprudent processes, because "[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 595, 598. Indeed, the Supreme Court employs a "heighten[ed] [] fairness concern" for ERISA plaintiffs at the pleadings stage, because the justification (or lack of) for a fiduciary's decision will "turn on facts one would expect to be in the fiduciary's possession." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 705 (2025); *Cunningham* is one of many unanimous Supreme Court cases rejecting arguments that would heighten a pleading standard and limit liability for ERISA fiduciaries.[6] *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) ("we do not believe that the presumption [proposed in favor of the fiduciaries] here is an appropriate way to weed out meritless lawsuits."); *Tibble*, 575 U.S. 523; *Hughes*, 595 U.S. 170.

"It is in this light that [courts] read the Supreme Court's directive [in *Hughes I*] to recognize the 'difficult tradeoffs' that an ERISA fiduciary faces, and the 'range of reasonable judgments' that may be made" as "alternative explanations [that] need not be conclusively ruled out at the pleadings stage." *Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023) ("*Hughes II*"); *see also Mator*,

[6] Defendants egregiously mispresent Supreme Court precedent. *Cunningham* actually *rejected* the assumption that ERISA claims are meritless and should be dismissed. *See Cunningham*, 604 U.S. at 707. Likewise, *Hughes* did not hold that courts must assume that fiduciaries were always prudent and made reasonable choices simply because there is a range of reasonable options. Hence why the Court in *Hughes*, *Tibble*, *Fifth Third Bancorp*, and *Cunningham* reversed dismissal.

102 F.4th at 184 ("a plaintiff alleging an ERISA fiduciary breach need not 'rule out every possible lawful explanation for the conduct he challenges.'"); *Braden*, 588 F.3d at 597 (same) *Sacerdote v. New York Univ*., 9 F.4th 95, 108 (2d Cir. 2021) ("Such an argument 'goes to the merits and is misplaced at this early stage.'" Courts "do not require an ERISA plaintiff 'to rule out every possible lawful explanation for the conduct he challenges.'"). Inherently, failing to monitor a plan's fees and the market is not within the range of reasonable fiduciary judgments. *See Mator*, 102 F.4th at 180, 185 (failing to conduct "competitive bidding" is outside a fiduciary's "'range of reasonable judgments[,]'" when the fees are "several times" the rates of other plans).

**B. The Plan's Services Rendered for the Fees Paid are Adequately Alleged**

To the extent that an RKA fee arrangement is in dispute, "the court adjudicating a motion to dismiss must accept the truth of the plaintiff's well-pled allegations, thus making the prudence of [the fees] a potential issue for summary judgment or trial." *Matney.*, 80 F.4th at 1152. Defendants have already attempted to mislead this Court with their version of events based on the same attachments, and Plaintiffs have explained that these attachments do not contradict Plaintiffs' calculation of RKA fees in relation to the alleged RKA services. *See* Dkt. 39 at 5, 7-9; § II.B *supra*. Defendants reattach the same excerpts of fee agreements and fee disclosures which are still not referenced in the SAC or judicially noticeable for the truth of their contents. *See id*.; *Navajo Nation v. Urb. Outfitters, Inc*., 935 F. Supp. 2d 1147, 1157 (D.N.M. 2013) (refusing to "consider excerpted portions of a" record); *Sugar v. Tackett*, No. 20-cv-00331, 2021 WL 5867951, at *3 (D.N.M. Dec. 10, 2021) ("A court may 'take judicial notice of publicly-filed records in our court' […] but the Court will not accept as true the substantive matter of the" record, particularly if it is "subject to reasonable dispute."). Defendants again insist that the Court accept as true facts not alleged in the SAC and, worse yet, in Defendants' favor. This Court has already explained that "[t]he court's

function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Order at 8.

In any event, Defendants' explanation is facially incorrect. The trustee fees are not a part of the RKA fees in the Form 5500s, and the trustee and custodial fee section is separate from the Recordkeeping section in all of Defendants' attachments.[7] *See* § II.B, *supra*. The fee disclosures also show that Defendants disingenuously omit the hourly fee portion of the RKA fees, as Defendants only cite the base fee portion. This Court previously "note[d]" the Parties' fee "discrepancy and d[id] not accept any of the facts contained in either set of documents as true." Order at 4 n.5. There is no reason for the Court to accept Defendants' version of facts now.

It is also implausible that "INTRUST's total compensation includes more than the Plan's recordkeeping fees" (unless Defendants are admitting "trustee and custodial fees" paid to INTRUST are really recordkeeping fees in disguise, *see* n. 7) when only recordkeeping services are listed in relation to the amount of fees paid. MTD at 10. To the extent that any fee discrepancy remains, and cannot certainly be attributed to the hourly portion of the RKA fees, it warrants discovery— not dismissal. *See Ramos v. Banner Health*, No. 15-cv-2556, 2017 WL 4337598, at *4 (D. Colo. Sept. 29, 2017) (an ERISA excessive fee case holding that "the interpretation and significance of competing documents tends to show that this is a matter that is *not* amenable to dismissal at this stage."); *Lopez v. Embry-Riddle Aeronautical Univ., Inc.*, No: 22-cv-1580, 2023 WL 7129858, at *11 (M.D. Fla. July 12, 2023) ("Even if the Court were to take judicial notice of

---

[7] Even if the trustee and custodial fees were included in the Form 5500, which they were not according to the codes entered in the Form 5500, the only reasonable explanation would be that Defendants themselves considered trustee and custodial fees as part of the RKA, hence why they didn't identify those fees differently from recordkeeping fees. That would confirm Plaintiffs' allegations of excessive RKA fees.

Defendant's external exhibits, the Court would still find that Plaintiff has plausibly alleged that the recordkeeping fees were needlessly high and would require additional discovery to ascertain as much."); *Parmer v. Land O'Lakes, Inc*., 518 F. Supp. 3d 1293, 1302 n.5 (D. Minn. 2021) (it is improper to submit ERISA "disclosure forms, to dispute the facts alleged in the complaint.").

The instant circumstances are unlike *Matney* where the allegations included "language from the" document that was not subject to dispute. *Matney*, 80 F.4th at 1157, 1158 n.19. The Tenth Circuit noted that in other cases where the Form 5500s explain "'what occurred in fact[,]'" as separate from the agreements, then courts must "'draw[] every reasonable inference in favor of Plaintiffs.'" *Matney*, 80 F.4th at 1152 n.13 (quoting *Kong v. Trader Joe's Co*., No. 20-cv-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022)); *see Perkins v. United Surgical Partners,* No. 23-cv-10375, 2024 WL 1574342, at *4 (5th Cir. Apr. 11, 2024) (distinguishing *Matney* because "there the documents the complaint referenced contradict[ed] the allegation […] But here, none of the documents referenced in the Amended Complaint appear to contradict Plaintiffs' claims."). In *Barrett*, "the 'service codes' in the Form 5500s show that O'Reilly's plan paid […] trustee fees." *Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135, 1139 (8th Cir. 2024). The trustee fee codes are not listed in the Form 5500s here, nor do Defendants point to any service code that would signify a non-recordkeeping service related to the fees.

Relatedly, the small forfeiture offsets are inconsequential, because basic math demonstrates that even after deducting the forfeiture offsets, Participants still paid far above the reasonable rates, including paying over $100 in some years (put differently, still more than double the reasonable $49 rate). *See* n.6, *supra*. So even if humoring the rates "[i]n [Defendants' view," the Plan's RKA fees were "still higher than the alleged fees of the other paragraph [103] plans." *Sealy v. Old Dominion Freight Line, Inc.*, No. 23-cv-819, 2024 WL 2212905, at **6–7 (M.D.N.C.

May 16, 2024) (denying dismissal in an excessive RKA fee case); *see also Lopez*, 2023 WL 7129858, at *11. The use of forfeitures goes to the scope of damages, not the plausibility of the excessive fees.

**C. The Meaningful Comparisons Must Be Viewed as A whole**

This Court previously reiterated *Matney's* principle that "there is no one way for plaintiffs to allege a meaningful benchmark," (Order at 11-12) because "[w]hat makes a cost comparison meaningful" will necessarily "depend on context" as " 'the content of the duty of prudence' is necessarily 'context specific.' " *Matney*, 80 F.4th at 1148 (citation omitted)). The complaint in *Matney* failed because it "compared the average recordkeeping fees from the 401k Averages Book against the Plan's recordkeeping fees" and the plaintiff "allege[d] ***no information*** about the recordkeeping services offered by the" plan or comparisons. *Id*., at 1157–58 (emphasis added); *but see Perkins*, 2024 WL 1574342, *5 (the Fifth Circuit reversing dismissal in a case using Form 5500s and distinguishing *Matney*, *Matousek v. MidAmerican Energy Co*., 51 F.4th 274 (8th Cir. 2022), and *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) as relying on industrywide averages as comparators); *Mator*, 102 F.4th at 188 (same).

Defendants commit several fatal flaws in alleging the SAC fails to allege meaningful comparators. The most obvious flaw is that Defendants improperly "'parse[] piece by piece" each allegation and inference (*Mator*, 102 F.4th at 190), instead of properly viewing the SAC as a whole" using a "context specific" approach. *Hughes I*, 595 U.S. at 177. The Plan compared to itself, the Comparator Plans, and the industry sources contextualizing the market all corroborate each other. Furthermore, Defendants cannot say the same flaws in the FAC are present in the SAC, because the comparisons and level of detail are not the same.

True, some complaints have failed "by simply" and ***solely*** "alleging that all RKA services are fungible." MTD at 19. But pertinent facts about the prevailing marketplace are not all that Plaintiffs allege. Plaintiffs additionally provide comparisons to the Plan's history and Comparator Plan's fees with specific services. "[A]lthough courts have dismissed imprudence claims premised on wholly conclusory allegations that services selected do not meaningfully affect the price of recordkeeping for large plans[,]" "Plaintiffs' allegations are more than wholly conclusory" because Plaintiffs use Form 5500s service codes and cite "industry experts" and the DOL to contextualize the marketplace for fees and services. *Dukes v. AmerisourceBergen Corp*., No. 23-cv-313, 2024 WL 4282309, at *6 (W.D. Ky. Sept. 24, 2024); *see* SAC ¶¶ 61-66, 91 101-03.

Plaintiffs also explain how the quality of services are comparable based on the top ten recordkeeper's experience and the technologies used to provide services. *See* SAC, ¶¶ 63, 72. Hence, "this is not a case where plaintiff simply declares that recordkeeping fees exceed a plaintiff's say-so amount or where plaintiff relies merely on 'generic allegations about similar services across the industry.'" *Stewart v. Nextera Energy, Inc*., No. 23-cv-81314, 2025 WL 3098085, at *5 (S.D. Fla. Aug. 14, 2025) (quoting *England v. DENSO Int'l Am. Inc*., 136 F.4th 638 (6th Cir. 2025)). Defendants provide nothing more than a "debate" against Plaintiffs' well pled allegations and the "pricing of RKA services." *Dukes*, 2024 WL 4282309, at *6. Contextualizing the prevailing RKA industry neither undermines nor contradicts the SAC, it enhances it.

**1. The Services are Comparable**

Of course, "plaintiffs must still allege sufficient facts to show 'that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan.'" Order at 12 (quoting *Matney* 80 F.4th at 1149). Now, the services alleged are more than similar, they are identical. *See* SAC, ¶¶ 95, 103. The FAC, however, did not include the same

detailed list of services next to each Comparator Plan nor a comparison of the Plan to itself. *C.f. SAC,* ¶¶ 50-55 86, 103, 110; FAC ¶ 112. The FAC only generally stated that the comparator plans were "coded in the categories discussed [] as common RKA coding." FAC, ¶ 107 n.16.

***Every appeals court to consider the issue has held that Form 5500 service codes can state a claim for excessive RKA fees***; however, in cases that affirmed dismissal, this endorsement was more in *dicta* because those plaintiffs failed to do so at all, or did so incorrectly, unlike here. Most similar to here, the Third Circuit in *Mator* upheld the use of a chart of comparator plans with Form 5500 service codes and direct-fee-to-direct-fee comparisons. *See Mator*, 102 F.4th at 186. In *Mator*, *Perkins*, and *Kruchten*, the courts explained that any "different service codes do not undermine the [] comparisons because they apparently overlap." *Id*; *see also Kruchten v. Ricoh USA, Inc*., No. 23-cv-1928, 2024 WL 3518308, at *3 (3d Cir. July 24, 2024) (same); *Perkins*, 2024 WL 1574342 at *4 n.6. Here the service codes comparing the Plan to itself represent identical services, and the Plan compared to the Comparator Plans have the same service codes, with the Comparator Plans sometimes having *additional* services for lower costs. To the extent any codes differ, the Comparator Plans had more codes, or did not include codes 50 / 63 which are "not a 'service' provided by the recordkeeper" but a fee structure, or the Comparator Plans only put either "15" or the duplicative code "64" for recordkeeping. SAC, ¶¶ 95; 51, 55; *see also Mator*, 102 F.4th at 186 ("All of the plans list either 'Recordkeeping fees,' 'Recordkeeping and information management [],' or both" and "it is unclear why the code 'Direct payment from the plan' exists at all, since every dollar reported on this part of Form 5500 is 'direct compensation.'"); *Coyer v. Univar Sols. USA Inc.*, No. 22-CV-0362, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) ("[t]he fact that each of the other similarly-sized plans were receiving at least the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence.");

*Daggett v. Waters Corp*., 731 F. Supp. 3d 121, 129, 134 (D. Mass. 2024) (allegations using Form 5500s to "establish that the Plan received no services that were materially different than the services received by the 'similarly-sized' plans" is commonly upheld).

In *Perkins*, the Fifth Circuit held that the challenged complaint was sufficiently plausible by alleging that "as the number of participants in a plan increases, the per-participant cost for recordkeeping services decreases" and the services alleged were based on Form 5500 codes. *Perkins*, 2024 WL 1574342, at **4-5. Likewise in *Hughes II*, on remand from the Supreme Court, the Seventh Circuit held that it was plausible to allege "the services provided by [comparable] existing recordkeepers" to other plans, and contextualizing how "the quality or type of recordkeeping services provided by competitor providers are comparable" is a well pled inference. *Hughes II*, 63 F.4th at 632.

The Second, Sixth, and Eighth Circuits agree with the Third Circuit's decision in *Mator,* that "the specific services provided to the plan" can plausibly compare services. *England*, 136 F.4th at 639. On the other hand, the complaint in *England* had ***no*** specified service codes and "the complaint provide[d] ***no details*** about the" services. *England*, 136 F.4th at 637 (emphasis added); *see also Singh v. Deloitte LLP*, 123 F.4th 88, 92 (2d Cir. 2024) (explaining that, unlike in *Singh*, the complaint in *Mator* pled with specificity the recordkeeping services provided by the plan, and "compared the Wells Fargo plan's fees to those of 11 other plans serviced by several of the 'top recordkeepers" which all provided "identical or similar services" as the plan at issue); *Schuster v. Swinerton Inc*., No. 24-cv-04970, 2025 WL 1069887, at *5 (N.D. Cal. Apr. 8, 2025) (distinguishing *Singh*, because "the allegations there—unlike here—lacked information on the number of services provided either by the plan at issue or the alleged comparators."). The Second Circuit in *Singh* approved of the plausibility found in *Mator*, but in *Singh,* unlike in *Mator* and here, the plaintiffs

"compared the Plan's combined direct and indirect costs for recordkeeping with only the direct costs of the comparator plans." *Singh*, 123 F.4th at 92. The court also approved of the plausibility in *Hughes II* where the plaintiffs "made multiple [other] allegations." *Id.*, at 96, 97. The Plan compared to itself and INTRUST's inexperience are other supporting allegations.

The court in *Barrett* agreed with the Third Circuit's holding in *Mator* that service codes can support plausibility if they are "sufficiently similar to render the comparisons valid." *Barrett*, 112 F.4th at 1140 (quoting *Mator*, 102 F.4th at 188). However, unlike here, in *Barrett* the trustee fee service codes were irrefutably listed with the RKA codes on the Form 5500s for the plan at issue, but not the comparator plans. *See id.*, at 1139-40; *c.f.,* SAC, ¶ 103; § II.B *supra* (no trustee codes were entered on the Form 5500s). The court also agreed with the holding in *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320 (3d Cir. 2019) that "bundles" of the "*same* services" supports plausibility. *Id.*, at 1138. *England*, *Singh*, and *Barrett* agree that service codes, when alleged similar to the specificity alleged here, can satisfy a comparison of fees and services.

**2. The Comparator Plans are Sufficiently Similar**

It bears repeating, the Comparator Plans here are more robustly pled than in the FAC, especially their services. In *Ramseur*, the court rejected the same arguments Defendants make here, because, exactly like here: (1) the Form 5500 service codes were alleged unlike in *England*; and (2) the comparator plans' size was similar to the plan unlike in *England*. *See Ramseur v. Lifepoint Health, Inc.*, No. 24-cv-00994, 2025 WL 2619151, at *3 (M.D. Tenn. Sept. 10, 2025). Exactly like *Ramseur*, Defendants' challenges to the Comparator Plans "invit[e] the Court to consider matters outside the pleadings" and improperly advances "competing interpretations" of the Form 5500s that "are irrelevant; the Court must assume Plaintiffs' allegations are true and draw all reasonable inferences in their favor." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In addition to having the same or more services as the Plan, the size of the Comparator Plans and range of their fees are also comparable. *See* n.4, *supra*. Plaintiffs especially note "[t]he Plan should have been able to obtain per participant recordkeeping fees in the $49 per participant range" based on several factors and surrounding context of the marketplace. SAC, ¶ 107. The Comparator Plan's fees range from $28.69 to $67.84. *Id.*, ¶103. Some Comparator Plans had higher fees because they had more services than other Comparator Plans (*see, e.g.*, the Ceridian Savings and Investment Plan). *Id*. Most Comparator Plans fall more towards the middle of this narrow range. A range makes sense to account for the extent that quality or any other factor could influence pricing on plans with at least the same services and roughly the same participants as the Plan. *See Sealy*, 2024 WL 2212905, at *6–7 (plausibly alleging comparator plans that paid "direct" RKA fees of "10.57, $28.11, $8.26, and $6.91, respectively."); *Sweda*, 923 F.3d at 330 (a range of comparator plan fees was sufficient). The reality remains: Plan participants always paid well above this range for the same or less services. Indeed, "[i]t would be inexplicable to say the services provided to the Plan by INTRUST were three [] times more valuable than services provided to similarly sized plans by more experienced recordkeepers." *Id.*, ¶105. Importantly, appellate Courts agree that a defendant's alternative explanation or justification for the higher fees is not obviously attributable to a fiduciaries' "range of reasonable judgments" when the plan's rate disparities are "several times" the rates of other plans. *Mator*, 102 F.4th at 185; *see also Perkins*, 2024 WL 1574342, at *3 (emphasis in original) (The defendants' arguments were "severely undercut by the Plaintiffs' allegation that the Plan's recordkeeping costs were significantly *higher* than those of comparable plans."); *Hughes II*, 63 F.4th at 635–36 (same).

Defendants attempt to mislead the Court by stating there is a "broad range" based on the roughly $30 difference between two Comparator Plans in 2022, but that misses the point. Both of

those plans had the same or more services as the Plan, while the Plan paid $179.06 which **was $119.19 more than the highest paying Comparator Plan in 2022.**[8] SAC, ¶ 103; *Coyer* v, 2022 WL 4534791, at *5; *Sweda*, 923 F.3d at 330. Tellingly, the Hilti Retirement Savings Plan that Defendants highlight is not the only Comparator Plan that paid far less than the reasonable fee alleged for the Plan. This shows that Plaintiffs' comparators are not cherry-picked for the lowest possible fees, but rather include a higher end of reasonable fees for a more conservative approach.

Further proof that the Comparator Plans are not cherry picked is that they are within 25% of the Plan's participant size. *See Mator*, 102 F.4th at 187 (the defendants argue that plans must be within "75% to 125% of the Plan's" number of participants would still sufficiently leave three comparators); n.4, *supra*. This is markedly different from *England* where the fundamental flaw was the lack of services alleged, and the reasoning was only partially because of the fact that "six of the alleged comparators have assets less than $500 million dollars—[…]— and thus do not even fit plaintiffs' definition of 'mega plans'" and the number of participants were more than 150% than that plan. *England*, 136 F.4th at 637; *but see Ramseur*, 2025 WL 2619151, at *3 (rejecting the argument that *England* foreclosed comparators based on size)

While some Comparator Plans do in fact appear in several years (*e.g.*, Adecco, Inc. Colleagues 401(k) Plan, Evoqua Water Technologies LLC Savings Plan), it cannot be assumed that the plans would have the same comparability of size and service every year. Defendants make much of the fact that some plans are not listed in every year, but that is an inconsequential argument that goes outside of the four corners of the SAC and improperly asks this Court to assume facts not pled in the SAC and view them in Defendants' favor. *See Ramseur*, 2025 WL 2619151, at *3

[8] The Court may also exclude any Comparator Plans that it deems outliers and still find the remaining comparisons sufficient. *See Mator*, 102 F.4th at 187.

(refusing to humor similar arguments). Defendants provide no authority that the same plan must be used for every year, which could result in plans having incomparable services and sizes.

Unlike Defendants' cases, the Comparator Plan chart alleges both the Plan's fees and several Comparator Plans for *each* year. Defendants distinguish their own cases by noting that in *Singh* the complaint only involved "a single year of comparator plans' data[,]"and in *Mateya* there was only "'costs in one year.'" MTD at 17 (quoting *Mateya v. Cook Grp. Inc*., No. 22-cv-1271, 2023 U.S. Dist. LEXIS 124838, at *23 (S.D. Ind. June 16, 2023)). Similarly, in *Miller* the plaintiffs compared "a several year average to a one-year data point" *Miller v. Pfizer, Inc*., No. 23-cv-594, 2024 WL 6968817, at *3 (W.D. Mich. Oct. 17, 2024). The Comparator Plans are meaningful.

**3. The Plan Compared to Itself is Meaningful**

While the FAC also included the same facts about the prevailing marketplace for RKA services, the SAC adds more specifics for the Plan and the comparisons. Significantly, the Plan's own history demonstrates actual services in relation to fees. In *Mator*, "receiv[ing] the same services from Fidelity that the[] [plan] had previously received from Wells Fargo" was also a meaningful comparator. *Mator*, 102 F.4th at 181; *see also Moore v. Humana, Inc*., No. 21-cv-232, 2022 WL 20766504, at *3 (W.D. Ky. Dec. 2, 2022) ("Plaintiffs [] include another important comparison: the Plan itself."). Exactly like in *Moore* the SAC demonstrates that the recordkeeping *services* entered on the Form 5500s were the same. "Defendants do not argue, nor would it make sense to argue, that the Plan offered dissimilar services compared to itself." *Moore*, 2022 WL 20766504, at *3. Defendants merely point out that the new code includes Code 63, but they do not address, let alone dispute, the allegation that "Code 63 is not a " 'service provided by the recordkeeper' and therefore, the RKA services provided by NestEgg and INTRUST were identical." SAC, ¶ 95. Defendants' improper exhibits also do not show any additional services.

Although it is not Plaintiffs burden to rule to eliminate every "possible lawful explanation" for the fees (*Braden*, 588 F.3d at 597), the SAC rules out the alternative explanation that a change in participant count would explain the jump in fees, because the number of participants remained "constant." SAC, ¶ 52. At this stage, these facts and inferences drawn are viewed in Plaintiffs' favor. *See* Order at 8.

Defendants attempt to exclude the Plan's history as key comparison by arguing that "the Plan's recordkeeping fees in 2012 and 2013 are outside of the Class Period" but Plaintiffs are not bringing allegations that Defendants' breached their duties before the Class period, especially by arguing that the fees were lower before the Class Period. MTD at 16 n.11. What happened before the Class Period is relevant to what occurred, or should have occurred, during the Class Period, especially considering studies that report that fees were trending in the opposite direction, declining, during the Class Period. *See* SAC, ¶ 53. The defendants in *Mator* similarly attempted to argue that "the six-year ERISA statute of limitations permits us to look back only as far as 2015" but the Third Circuit agreed with the Plaintiffs that, although plaintiffs "cannot collect damages for breaches before 2015, [] it is proper for their allegations to encompass a longer time period to allow for the necessary context-specific analysis." *Mator*, 102 F.4th at 188; *see also Sealy*, 2024 WL 2212905, at *3–4 (denying dismissal in an excessive RKA fee case and holding that because "[t]he parties agree that the allegations in this case are subject to this time limitation[,]" there is "no reason to dismiss any claim in part at this time on this ground because the class, if certified, would not extend beyond the proper limitations period.")

Defendants' other argument against the Plan compared to itself is to offer an alternative version of the Plan's fee history in an attempt to "merely argue in reply that lowering the recordkeeping fee suggests the fiduciaries were acting prudently." *Moore*, 2022 WL 20766504, at

*3 (rejecting this reasoning). In reality, the participants did not actually experience a decrease, and any decrease was insufficient to bring the Plan's fees in line with reasonable rates. Notably, courts have found that decreases do not contradict the allegations that defendants failed to lower rates as a prudent fiduciary would or that the fees were reasonable. *See Terraza v. Safeway Inc*., 2019 WL 1589979, at *2 (N.D. Cal. Mar. 6, 2019); *Mator*, 102 F.4th at 181 (similar); Order, at 17 ("[A] decrease in RKA fees is not dispositive of defendants' fulfilling their duty of prudence.")

While Defendants' exhibits may indicate that part of the RKA base fee alone "did not change between 2013 and 2019" (MTD at 16), industry sources in the SAC support the plausible allegations that the fees should have decreased dramatically to align with the marketplace, and Defendants should have conducted an RFP and lowered fees before 2019. *See* SAC ¶¶ 53, 89. In *Matney*, "the ***allegations show[ed]*** the Committee 'regularly re-negotiated their fee arrangement" and the fiduciaries re-negotiated fees three times in five years, obtaining at least a $15 reduction each time, unlike the allegations here that show there were no similar effective reductions. *Matney*, 80 F.4th at 1156-57 (emphasis added); *c.f.*, SAC ¶¶ 52-55 (the "fee increased dramatically"); ¶ 93 (alleging a $58.34 increases in 2019). At all times during the Class Period, the fees remained well above a reasonable rate. *See* SAC, ¶¶ 50-55, 93 103-07.

**D. The Fees Calculations are Comparable**

Defendants reraise their incorrect fee arguments from the SAC. As a foundational matter, "[r]evenue sharing allows fund providers to take a percentage of the revenue from plan participants' investments to defray the participants' recordkeeping and other administrative costs." *Hughes II*, 63 F.4th at 621. "Direct fees are paid from a plan's assets." *Mator*, 102 F.4th at 179. Hence, different fee structures do not affect the reasonableness of fees, let alone the relationship to services rendered. Critically, the comparisons are only between direct fees, and FAC does not

allege that the Plan's fee structure was imprudent. *See Mator*, 102 F.4th at 181 (the plaintiffs plausibly alleged that "the Plan's 'direct fees alone' […] were 'unreasonable.'"). This is especially true since the SAC now compares the Plan's fees to itself. *See Moore*, 2022 WL 20766504, at *3.

The Parties agree "that indirect fees to a recordkeeper, [] are not included on a Form 5500" and "Intrust did not receive indirect compensation." MTD at 15 (citing SAC ¶ 93 n.16). The paragraph Defendants cite explains that only the direct fees were calculated and are "consistent with the comparator plans." SAC ¶ 93 n.16. Accordingly, "attacks on plaintiffs' fee calculations" are a factual dispute "not properly considered at the motion-to-dismiss stage[,]" where "Plaintiffs have provided detailed methodology to explain how they arrived at the RKA fee totals." *Dukes*, 2024 WL 4282309, at *7. As explained previously, it is true that some of the Comparator Plan's Form 5500s checked that they also paid indirect fees, but Plaintiffs' calculations accurately exclude the indirect fees (for the plans that had them), because those forms entered "0" as the amount of indirect fees actually paid. *See* Dkt. 39, at 13-14. Defendants' arguments that unreported indirect fees mean that the comparators paid more than reported are contradicted by the Form 5500s cited in the SAC and attached to the MTD. *See* Dkt 63-19 at 30 (Page 7 of the Auditor's Report attached to the 2018 Form 5500 for the Adecco Plan) ("The Plan has a revenue-sharing agreement whereby certain investment managers return a portion of the investment fees to offset the Plan's administrative expenses and revenue applicable to certain funds are credited directly back to the participants" rather than raise the fees). In *Matney*, the indirect fees were "revenue sharing [that] provided plan participants with a discount" instead of leading to higher fees. *Matney*, 80 F.4th at 1151. Hence, Defendants improperly, and baselessly, ask this Court to assume that the indirect fees resulted in the Comparator Plans paying the same as the Plan, meaning *more than three times* what they stated in their Form 5500s. See SAC ¶ 94.

Defendants' cases are inapposite because they did not use the same consistent methodology, and comparison of only direct fees, as is the case here. *See* SAC ¶ 93 n.16. In *Garnick*, the court actually denied dismissal because there was at least one meaningful comparison, but the inapt comparators were rejected due to the plaintiffs comparing "direct and indirect compensation to only direct recordkeeping fees" unlike the direct fee only comparisons here. *Wake Forest Univ. Baptist Med. Ctr., Bd*., 629 F. Supp. 3d 352, 364 (M.D.N.C. 2022); *see also* Defendants' cases of *Peeler v. Bayada Home Health Care, Inc*., No. 24-CV-00231, 2026 WL 208630, at *10 (W.D.N.C. Jan. 27, 2026) ("they compare the Plan's recordkeeping fees, which included both direct compensation and revenue-sharing, to recordkeeping fees incurred by plans that included only direct compensation"); *Singh*, 123 F.4th at 95. Defendants have not provided a case where comparing direct fees to direct fees was implausible. In fact, Defendants cite to *Mateya*, where the court held that plaintiffs can allege "direct fees to direct fees" but those plaintiffs failed to do so. MTD at 16 (quoting *Mateya*, 2023 U.S. Dist. LEXIS 124838, at *22).

**E. Plaintiffs' Supporting Theories Infer Imprudent Processes**

Defendants' fixation on the FAC ignores two dispositive points: (1) the SAC now alleges robust, plausible fee comparisons; and (2) the SAC must be evaluated holistically. *See Hughes I*, 595 U.S. at 177. Without a plausible benchmark, allegations regarding RFPs or a recordkeeper's inexperience may be "too attenuated for it to raise an inference of imprudence." Order at 17. That is not the same, as Defendants improperly insist, as saying that these allegations cannot support a complaint *with* plausible fee comparisons. Plaintiffs' supporting allegations contextualize the fee comparisons and underscore that Defendants had imprudent processes—not merely that fees were high. *See Braden*, 588 F.3d at 589–90; *Mator*, 102 F.4th at 185 ("Although reasonable fiduciaries

need not prioritize cost minimization above all else, there is enough evidence alleged here of a failure to act prudently.”).

This Court correctly observed that selecting a recordkeeper with less experience “does not, *in itself*, constitute imprudence.” Order at 17 (emphasis added) INTRUST’s relative inexperience is probative when considered alongside the now plausibly excessive fees. Under the instant “context specific” allegations, (*Hughes I*, 595 U.S. at 177), paying premium rates to an inexperienced provider raises a reasonable inference that Defendants failed to ensure the arrangement was prudent. These allegations must be considered in tandem with the allegations that recordkeeping is largely technology-driven and widely commoditized among major providers servicing similarly sized plans. INTRUST’s inexperience also renders implausible, and certainly non-obvious, the idea that the quality of services provided by an inexperienced provider could justify such astronomical fees.

Likewise, the RFP allegations were previously insufficient only because the fee comparisons were implausible. With that deficiency cured, the RFP allegations now reinforce the inference of imprudence. Defendants misrepresent *Matney* and this Court’s prior holding which explained that “in [*Matney*] “[s]imply alleging the Committee needed to conduct regular RFPs does not raise a plausible inference of imprudence[,]” but because “ ‘the appropriate inquiry will necessarily be context specific,’ […] ***Matney is limited to the context in which that case was decided.***” Order at 17 (internal citations omitted) (emphasis added). In the context of this case, where there are no undisputed negotiations, the RFP allegations are plausible. To be sure, the Tenth Circuit has affirmed that ERISA fiduciaries are liable if they “failed to monitor the reasonableness of recordkeeping fees” and “never assessed the reasonableness of fees using any form of a competitive bid process, RFP or otherwise.” *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1106

(D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021); *see also Hughes II*, 63 F.4th at 621-22 (upholding claims that "Northwestern should have lowered its expenses by […], soliciting bids from competing providers, and using the massive size and correspondent bargaining power of the Plans to negotiate."); *Mator*, 102 F.4th at 180 (same); *Perkins*, 2024 WL 157434, at *4 n.7 (same). In *Matney*, there was no dispute that "they renegotiated their RKA fees three times in five years, securing a reduction in fees each time[,] but "a decrease in RKA fees is not dispositive of defendants' fulfilling their duty of prudence" in all contexts. Order, at 17-18.[9] In this context, the SAC does not demonstrate any similar reductions that could be due to prudent negotiations, as the amounts reported as paid fluctuated and increased when they should have decreased. *See* SAC, ¶ 53. The allegations accepted as true in the SAC holistically infer imprudence.

### F. Plaintiffs' Duty to Monitor Claim is Plausible

Because the SAC's failure to monitor claim is derivative claim of the underlying breaches, if the FAC plausibly alleges the underlying breaches, the duty to monitor is also plausibly alleged.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss Plaintiffs' Complaint, or in the alternative grant Plaintiffs leave to amend.

Dated: March 3, 2026

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(Admitted *Pro Hac Vice*)
James A. Maro, Esquire
PA Attorney ID #86420
(Admitted *Pro Hac Vice*)
312 Old Lancaster Road

[9] Courts have found evidence of fee reductions can support a plausible inference of fiduciary breach. *Hughes*, 63 F.4th at 632. This is because a fee reduction "suggests that [the] fees were unreasonably high and that means to lower such fees were available." *Id*.

Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Telephone: (610) 890-0200

Mark D. Lyons, Esquire
OBA #5590
**LYONS & CLARK, INC.**
Two Main Plaza Bldg,
616 South Main, Suite 201
Tulsa, OK 74119
Email: lyonscla@swbell.net
Telephone: (918) 599-8844

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2026, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: *_/s/Mark K. Gyandoh_*
Mark K. Gyandoh, Esq.